IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

**STATE OF TENNESSEE v. WILLIE DOCKINS**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 97-00159    Joseph B. Brown, Judge**

———————————

**No. W1998-00354-CCA-R3-CD - Decided June 8, 2000**

———————————

Defendant Willie Dockins was convicted of first degree murder by a jury in the Shelby County Criminal Court. Defendant was subsequently sentenced to life imprisonment in the Tennessee Department of Correction. Defendant challenges his conviction, raising the following issues: (1) whether the trial court properly determined that he was competent to stand trial; (2) whether the trial court should have declared that he was insane at the time the offense was committed; (3) whether the trial court erred when it admitted a gun into evidence after a security latch had been removed; and (4) whether the evidence was sufficient to support his conviction. After a review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

WOODALL, J., delivered the opinion of the court, in which WADE, P. J. and WITT, J. joined.

Arch B. Boyd, III, Memphis, Tennessee, for the appellant, Willie Dockins.

Paul G. Summers, Attorney General and Reporter, Kim R. Helper, Assistant Attorney General, William L. Gibbons, District Attorney General, Janet Shipman, Assistant District Attorney General, and Paul Goodman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  FACTS**

Jewell Rogers testified that on January 26, 1996, she was living in a house on Leath Street with her granddaughter Jewell Jones, the victim in this case. That same date, Rogers took the victim to a dance at school. The victim subsequently returned to the home on Leath Street, where Rogers saw her talking to two young men outside. The victim then came into the house and stated that she had been shot. Shortly thereafter, the victim fell into Rogers' arms and Rogers could see that she had blood coming out of her mouth. The victim died a short time later.

Matoya Perry testified that she was a friend of the victim. While Perry was at a school dance on January 26, 1996, she observed an altercation between her cousin and the co-defendant, Jerry Jones. When Perry subsequently went outside, the co-defendant took his shirt off and approached her "like he was ready to fight." At this point Perry put her coat down and she was immediately stabbed by the co-defendant's sister. Perry then began fighting with the co-defendant's sister. After the fight ended and Perry attempted to leave the school parking lot, the co-defendant approached Perry with a gun. Perry and a nearby group of individuals ran away and Perry eventually reported the incident to the police.

Travis Davidson, the victim's cousin, testified that after the school dance on January 26, 1996, he observed two crowds in an area where some individuals were "throwing blows," but he could not identify the individuals. Davidson also observed the co-defendant run up the street and yell that he was going to get a gun. Davidson could also see that the co-defendant was not wearing a shirt and his face was bleeding. At this point, Davidson and the victim ran to their grandmother's house.

Davidson testified that a group consisting of Defendant Willie Dockins, the co-defendant, and some other individuals subsequently came to his grandmother's house and began asking questions about somebody with whom they had been fighting. The group left, but Defendant and the co-defendant subsequently returned to the house. Davidson eventually went in the house while the victim remained outside with Defendant and the co-defendant. Davidson then heard a boom and when he looked outside, he saw Defendant and the co-defendant running away.

DaRobert Jones, Davidson's brother, testified that after the dance at the school, he was involved in a fight between the Leath Street group and the Scutter Field group. Jones observed that while he was fighting on behalf of the Leath Street group, the co-defendant was fighting on behalf of the Scutter Field group. Jones subsequently left the fight when "[s]omebody screamed out in the crowd that they were going to get a gun."

Jones testified that after the fight, he went to his grandmother's house. Jones subsequently observed the victim outside talking to the co-defendant and an individual who was wearing a skull cap. Shortly thereafter, Jones heard a "pow" and when he looked outside, he saw the "guy with the skull cap running with a gun in his hand" along side the co-defendant. Jones noticed that the gun was a chrome revolver.

Marcus Pearson testified that he observed the fight after the school dance and he saw "some boys off Leath Street" jump on the co-defendant and injure him. Pearson subsequently went with Defendant, the co-defendant, and two other individuals to Leath Street in order to obtain the names of the people who had injured the co-defendant. The group eventually ended up at the residence of the victim on Leath Street where they had a conversation with Davidson. During the conversation, the group questioned Davidson about the names of the individuals who had been in the fight and they asked Davidson where his brother was. Thereafter, Pearson and the two other individuals parted company with Defendant and the co-defendant. When Pearson left, he heard Defendant say that he was "going to do something bad."

Pearson testified that later that same day, he played basketball with Defendant. At that time, Defendant told Pearson that he had shot the victim after she said something to him. Defendant also told Pearson that immediately before he shot the victim, he told her "it ain't going to be nothing, Bitch." Pearson also saw Defendant with a revolver that had a purple handle.

Michael Tart testified that he assisted the co-defendant in the fight after the school dance. After the fight, Tart accompanied the co-defendant to his house, where the co-defendant retrieved a silver gun with a purple handle. Tart then saw Pearson approach the residence and he heard Pearson say, "let's go get them." The co-defendant and Pearson then attempted to leave, but they were stopped by the co-defendant's mother.

Tart testified that after the co-defendant's mother left, a group consisting of Defendant, the co-defendant, Tart, Pearson, and another individual formed and eventually left the residence. When Tart began walking away from the group, Defendant stated, "if you ain't with us, you without us." Tart then rejoined the group and the group went to the home of the victim's grandmother. When the group arrived, they asked for Davidson to come outside and when he refused, Defendant "got mad" and stated, "we need to quit bull-shitting around." Tart then became confused because he believed that the group's purpose was to "fight and get some names."

Tart testified that at this point, the group started to walk away. Defendant then told three members of the group to leave, and he asked the co-defendant for a gun. The co-defendant then reached into his pocket and shortly thereafter, Tart saw Defendant holding a silver gun with a purple handle. As Tart and the others left, he saw Defendant and the co-defendant walking back in the direction of the victim's residence. Tart subsequently heard a gunshot.

Tart testified that Defendant had repeatedly asked the co-defendant for the gun before the shooting. Tart was not sure why Defendant had joined the group, other than "[Defendant] just came by to be nosey and to start something at the time."

Roosevelt Taylor testified that he was with the group that went to the residence of the victim on January 26, 1996. Before they got to the house on Leath Street, Taylor observed that the co-defendant was holding a chrome gun. Taylor left the group after they arrived at the house, but he encountered Defendant a short time later. At that time, Defendant gave Taylor the gun and told Taylor to "get rid of it." Defendant stated that he had shot the victim in the chest. Defendant also told Taylor that "he was trying to get the boy to come out the house, and the boy wouldn't come out the house. So he shot the girl in the chest."

Taylor testified that after Defendant gave him the gun, he colored the handle blue and hid it in his sister's residence. Taylor's sister subsequently gave the gun to the police.

Officer Cham Payne of the Memphis Police Department testified that he recovered the gun in this case. All parties stipulated that the bullet recovered from the body of the victim was fired from the gun.

Dr. Wendy Gunther testified that she performed an autopsy on the body of Jewell Jones. During the autopsy, Dr. Gunther observed that there was one bullet wound on the left breast and Dr. Gunther recovered one bullet from the body. Dr. Gunther opined that the victim died from a gunshot wound through the heart. Dr. Gunther also opined that the bullet's path was consistent with a gun pointed at the chest.

Sergeant Ottis Stewart of the Memphis Police Department testified that he interviewed the co-defendant as part of his investigation of this case. During the interview, the co-defendant stated that he was with Defendant when Defendant shot the victim with a chrome revolver that had a purple handle. The co-defendant also stated that before Defendant shot the victim, he heard Defendant say, "There ain't no love lost."

Lieutenant A.M. DeWitt of the Memphis Police Department testified that he interviewed Defendant as part of his investigation of this case. During the interview, Defendant stated that when he learned that the co-defendant had been in a fight and Tart had failed to assist the co-defendant, he became angry and stated, "Man, I'll help you fight. I'll come up there everyday after school and help you fight." Defendant also stated that Taylor and Pearson then said, "We need to get clicked up, to get some more N-----s, and fall on Leath Street and take care of our business." Defendant stated that in response, he told the co-defendant that he would go with him. Defendant admitted in his statement that the reason he and the other members of the group went to Leath Street was to "fight the boys who jumped on [the co-defendant] because they all lived on Leath Street." Defendant also stated that when the group arrived at Leath Street, Pearson said, "One of the dudes live right here and his name is Travis." Defendant stated that the group then questioned Davidson about the fight, and Davidson denied fighting the co-defendant. Defendant also told the police that after Davidson went back in the house and came back out, Defendant told him "You-all need to quash this shit," and he told Davidson to shake the co-defendant's hand. Defendant stated that when Davidson refused to shake the co-defendant's hand, Defendant "told that little dude Travis that he making it seem like it ain't through with the situation."

Defendant testified that while he and the co-defendant were walking to the home of the victim on Leath Street, he confiscated the gun from the co-defendant in order to avoid getting into trouble. Defendant also testified that while he was talking to the victim, he accidently dropped the gun. When the victim questioned Defendant about the gun, Defendant picked up the gun and pulled the trigger in order to show the victim that the gun was not loaded, which caused the gun to fire accidentally. Defendant and the co-defendant then ran away from the scene.

Defendant testified that even though the victim screamed when the gun was fired, he was not aware that he had shot her. Defendant admitted that after he ran from the scene, he gave the gun to Taylor because he "didn't want to get caught with the weapon."

Defendant admitted that when he gave his statement to the police after the shooting, he lied to them when he stated that the co-defendant was the one who shot the victim. Defendant testified that he lied to the police "so it make [him]self look innocent."

## II. COMPETENCY

Defendant contends that the trial court erred when it found that he was competent to stand trial. We disagree.

Initially, we note that Defendant has cited absolutely no authority in support of his argument. Thus, this issue is waived. Tenn. Ct. Crim. App. R. 10(b). Notwithstanding waiver, we conclude that Defendant is not entitled to relief on the merits.

Dr. Samuel Craddock, a clinical psychologist from the Middle Tennessee Mental Health Institute, testified during the competency hearing that he evaluated Defendant during the period from April 21 to May 14, 1998. After evaluating Defendant, Dr. Craddock formed the opinion that Defendant was competent to assist counsel and further, there would be no basis for asserting an insanity defense at trial. Dr. Craddock also evaluated Defendant on the morning of the competency hearing and Dr. Craddock found no substantial change in Defendant's condition.

On cross-examination, Dr. Craddock acknowledged that Dr. Wyatt Nichols had concluded that Defendant's competency and sanity were "questionable." However, Dr. Craddock also noted that Defendant had been uncooperative at the time of Dr. Nichols' evaluation and as a result, the assessment could not be completed. Dr. Craddock also testified that even if Defendant was hearing voices as he claimed, that would not interfere with his ability to concentrate, function, or participate at trial.

Defendant testified that he had been hearing the voice of the victim and the victim had even visited him in his cell. Defendant also testified that he had attempted to commit suicide.

A letter submitted to the trial court from Larry Southard, Director of Forensic Services for the Middle Tennessee Mental Health Institute, states that after completing an evaluation, the clinical staff was of the opinion that Defendant is able to "adequately assist in his defense in a court of law." The staff based this determination on findings that Defendant "does understand the charges pending against him and the consequences which may follow and he is able to advise counsel and participate in his own defense." In addition, the staff concluded that a defense of insanity could not be supported in this case.

At the conclusion of the competency hearing, the trial court found that Defendant was competent to stand trial. The trial court stated that it appeared from Defendant's testimony that he was "competent and knowledgeable of his circumstances and the background of the case and his situation." The trial court also noted that it was apparent that Defendant understood that he had not actually heard the voice of the victim and instead, such occurrences were simply nightmares.

The standard for determining whether a defendant is competent to stand trial is set forth in Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960):

> [T]he "test must be whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding--and whether he has a rational as well as a factual understanding of the proceedings against him."

Id., 362 U.S. at 402, 80 S.Ct. at 789. This standard has been adopted in Tennessee. See State v. Black, 815 S.W.2d 166, 174 (Tenn. 1991); State v. Leming, 3 S.W.3d 7, 14 (Tenn. Crim. App. 1998). "The burden is on the defendant to establish his incompetency to stand trial by a preponderance of the evidence." Leming, 3 S.W.3d at 14. "On appeal, the trial court's findings are conclusive unless the evidence preponderates otherwise." Id.

The evidence in this case does not preponderate against the trial court's determination that Defendant was competent to stand trial. Indeed, we can find nothing in the record which would reasonably lead the trial court to question Defendant's competence. Quite simply, there is nothing in the record that contradicts the conclusion of the staff at the Middle Tennessee Mental Health Institute that Defendant "does understand the charges pending against him and the consequences which may follow and he is able to advise counsel and participate in his own defense." Under these circumstances, we conclude that the trial court did not abuse its discretion when it found that Defendant was competent to stand trial. Defendant is not entitled to relief on this issue.

### III. INSANITY

Defendant contends that the trial court should have declared that he was insane at the time of the commission of the offense. We disagree.

We note that as with the previous issue, Defendant has cited absolutely no authority in support of his argument. Thus, this issue is waived. Tenn. Ct. Crim. App. R. 10(b).

In addition, Rule 12.2(a) of the Tennessee Rules of Criminal Procedure expressly states that a defendant must give written notice of an intent to rely upon the insanity defense and if the defendant fails to do so, "insanity may not be raised as a defense." Tenn. R. Crim. P. 12.2(a). No such notice appears in the record and in fact, Defendant's trial counsel admitted during the competency hearing that he had not filed any notice of intent to rely on the insanity defense. Therefore, the defense of insanity was not available to Defendant in this case.

Further, insanity is an affirmative defense which a defendant must prove by clear and convincing evidence. Tenn. Code Ann. § 39-11-501(a) (1997). The determination of a defendant's sanity at the time of the crime is a question of fact for the jury upon consideration of all the evidence. See State v. Sparks, 891 S.W.2d 607, 616 (Tenn. 1995). Thus, even if Defendant had filed the required notice, Defendant's sanity at the time of the commission of the offense would have been a question for the jury and it would have clearly been improper for the trial court to resolve this issue before trial. Defendant is not entitled to relief on this issue.

### IV. INTRODUCTION OF EVIDENCE

Defendant contends that the trial court committed reversible error when it allowed the gun to be introduced into evidence after its appearance was altered by the removal of a security latch. We disagree.

Once again, Defendant has failed to cite any authority whatsoever in support of his argument. Thus, this issue is waived. Tenn. Ct. Crim. App. R. 10(b). Moreover, the record indicates that Defendant failed to make any objection when the gun was introduced into evidence during the direct examination of Taylor. By failing to make a contemporaneous objection, Defendant has waived this issue. Tenn. R. App. P. 36(a).

In addition, Defendant has failed to identify any part of the record which indicates that the gun was in fact altered in any manner before it was introduced into evidence. Thus, it is unclear whether the alleged alteration actually occurred. Nevertheless, we conclude that even if the gun was altered in the manner Defendant claims, Defendant is not entitled to relief on the merits.

Although Defendant's argument for this issue is far from clear, it appears that he contends that the removal of the security latch hampered his ability to support his theory of defense that the gun discharged when he accidentally dropped it. However, Defendant has failed to offer any explanation for how his ability to advance this theory was affected. Moreover, contrary to what Defendant claims in his brief, he did not testify at trial that the gun discharged when he dropped it. Rather, Defendant testified that the gun discharged after he picked it up and "pulled the trigger click, click, click." We can see no way in which the presence of the security latch would have discredited the State's theory that Defendant fired the gun intentionally and would have supported Defendant's theory that he fired the gun only because he was unaware that it was loaded. In addition, we note the jury was shown two photographs of the gun as it appeared when it was discovered by the police.

In short, Defendant has failed to demonstrate any prejudice from the manner in which the trial court admitted the gun into evidence. Thus, any error was clearly harmless. See Tenn. R. Crim. P. 52(a). Defendant is not entitled to relief on this issue.

## V. SUFFICIENCY OF THE EVIDENCE

In five separate issues that are essentially identical, Defendant contends that the evidence was insufficient to support his conviction. We disagree.

Initially, we note that Defendant has failed to support his contention with any citation to the record and further, he has failed to support his contention with any argument other than four conclusory sentences which simply state that the evidence in this case was insufficient. Thus, this issue is waived. Tenn. Ct. Crim. App. R. 10(b). Notwithstanding waiver, we conclude that Defendant is not entitled to relief even on the merits.

Where the sufficiency of the evidence is contested on appeal, the relevant question for the reviewing court is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct.

2781, 2789, 61 L.Ed.2d 560, 573 (1979). In determining the sufficiency of the evidence, this Court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this Court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). To the contrary, this Court is required to afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. State v. Tuttle, 914 S.W.2d 926, 932 (Tenn. Crim. App.1995). Since a verdict of guilt removes the presumption of a defendant's innocence and replaces it with a presumption of guilt, the defendant has the burden of proof on the sufficiency of the evidence at the appellate level. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Under Tennessee law, first degree murder is "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1997). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-106(a)(18) (1997). "'[P]remeditation' is an act done after exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d) (1997). Although premeditation requires that "the intent to kill must have been formed prior to the act itself[,] [i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d) (1997). The element of premeditation is a question for the jury which may be inferred from the circumstances surrounding the killing. State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993). Tennessee courts have delineated several circumstances that may be indicative of premeditation, including the use of a deadly weapon upon an unarmed victim, State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997), facts from which motive may be inferred, State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995), and calmness immediately after the killing, Bland, 958 S.W.2d at 660.

We conclude that when the evidence in this case is viewed in the light most favorable to the State, as it must be, the evidence was sufficient for a rational jury to find beyond a reasonable doubt that Defendant killed Jewell Jones intentionally and with premeditation.

First, the State introduced evidence from which a motive may be inferred. Several witnesses testified that the co-defendant was involved in a fight after the school dance and DaRobert Jones testified that the co-defendant was fighting on behalf of the Scutter Field group against the Leath Street group. Defendant told the police in his statement that when he learned that the co-defendant had been in a fight, he became angry and stated, "Man, I'll help you fight. I'll come up there everyday after school and help you fight." Defendant also told the police that when Taylor and Pearson said, "We need to get clicked up, to get some more N----s, and fall on Leath Street and take care of our business," he told the co-defendant that he would go with him. Defendant admitted in his statement to the police that the reason he and the other members of the group went to Leath Street was to "fight the boys who jumped on [the co-defendant] because they all lived on Leath Street."

Defendant told the police that when the group arrived at Leath Street, Pearson said, "One of the dudes live right here and his name is Travis." Pearson testified that the group then questioned Davidson about the fight and all of the members of the group except for Defendant and the co-

defendant eventually left. In addition, Pearson testified that when he left, he heard Defendant say that he was "going to do something bad." Tart testified that when Davidson refused to come outside, Defendant "got mad" and stated "we need to quit bull-shitting around." Tart also testified that when Defendant told the other members of the group to leave, Defendant asked the co-defendant for a gun. Defendant told the police that when Davidson refused to shake the co-defendant's hand, Defendant "told that little dude Travis that he making it seem like it ain't through with the situation."

Pearson testified that when he saw Defendant after the shooting, Defendant stated that he shot the victim after she said something to him and he told her "it ain't going to be nothing, Bitch." In addition, the co-defendant told the police that before Defendant shot the victim, Defendant said, "There ain't no love lost." Taylor testified that Defendant told him that "he was trying to get the boy to come out the house, and the boy wouldn't come out the house. So he shot the girl in the chest."

Second, the evidence clearly established that Defendant used a deadly weapon to kill an unarmed victim. There is no dispute that the victim was unarmed when Defendant killed her.

Third, there was evidence that Defendant was calm immediately after the killing. Indeed, Pearson testified that he played basketball with Defendant after the shooting. Further, the evidence established that Defendant had the presence of mind to have Taylor hide the murder weapon because he "didn't want to get caught with the weapon." In addition, Defendant subsequently lied to the police and told them that the co-defendant was the one who shot the victim "so it make [him]self look innocent."

We conclude that a rational jury could infer from the above evidence that Defendant became angry when he learned that the co-defendant had been injured by a group from Leath Street, Defendant decided to go to Leath Street to seek revenge, Defendant was displeased when Davidson refused to shake the co-defendant's hand, Defendant was displeased again when Davidson refused to come out of the house, Defendant directed his displeasure toward the victim when Davidson remained inside the house, Defendant exchanged words with the victim, Defendant decided to direct his desire for revenge at the victim, and Defendant decided to kill the victim at least a short period before he shot her in the chest. Under these circumstances, we conclude that the evidence was sufficient for a rational jury to find beyond a reasonable doubt that Defendant killed Jewell Jones intentionally and with premeditation. Defendant is not entitled to relief on this issue.

Accordingly, the judgment of the trial court is AFFIRMED.