**STATE of Tennessee, Plaintiff–Appellee,**

**v.**

**Donald Wade SPARKS, Defendant–Appellant.**

Supreme Court of Tennessee, at Knoxville.

Jan. 3, 1995.

Charles W. Burson, Atty. Gen. and Reporter, Rebecca L. Gundt, Asst. Atty. Gen., Nashville, for plaintiff-appellee.

Charles Dungan, Dungan & Meares, Maryville, for defendant-appellant.

*OPINION*

REID, Justice.

This case presents an appeal from the conviction of Donald Wade Sparks for first degree murder. The trial court rejected the plea of insanity, the only defense asserted by the defendant, and the Court of Criminal Appeals affirmed. On this appeal, only two issues will be considered: whether the proof was sufficient to prove sanity beyond a reasonable doubt, and the related issue, whether the trial judge erred by allowing one of the arresting officers to testify that in his opinion the appellant was sane according to the legal definition of sanity. This Court finds that the evidence is not sufficient to support the finding that the defendant was sane beyond a reasonable doubt at the time the offense was committed, and, therefore, the defendant is not guilty by reason of insanity.

I

The defendant shot and killed his mother on June 12, 1990. He was 29 years old. He lived in a trailer which was parked adjoining the residence occupied by the victim, Jo Ann Taylor, and his stepfather, Don Taylor. The trailer had been purchased for the defendant by the victim after he had been sent home from Atlanta in 1988 by his brother Jeffrey, who, though supportive of the defendant, "just couldn't handle him anymore."

The defendant has a long history of mental illness, diagnosed as a schizoaffective disorder. The evidence includes medical records dating back to September of 1982, when he was first admitted as a patient to Overlook Mental Health Center. He later was discharged, but became a patient again in December of 1987, and has remained a patient at the center since then. Throughout his illness, various drugs have been prescribed to treat the defendant's symptoms of mental confusion, auditory and visual hallucinations, anxiety, depression, paranoia, memory lapses, and aggressiveness. At the time the offense was committed, he was being medicated with Haldol by injection once a month. He had received the last injection on May 18, 1990, three weeks before he shot his mother.

According to Jeffrey Sparks, the defendant was "different" when he came home from service in the army in 1983,

> ... he couldn't hold a conversation.... and he would just, out of the blue, start talking about something else. And, I knowed that, you know, there was something wrong with him.

From 1983 to 1988, the defendant, who had a ninth grade education, lived in Atlanta where he worked with Jeffrey as a roofer. Jeffrey testified that his brother was "off" and related several incidents supporting that opinion. In 1983, the defendant "went off his rocker" and told his sister's boyfriend to leave her house, causing a serious confrontation with his sister and her friend. According to Jeffrey, during the roofing jobs, he sometimes "had to get the law to get him down off of the roof." Jeffrey testified that he was afraid of the defendant when he was "crazy", and had committed him to mental institutions because of his mental problems on at least two occasions, "maybe three." The defendant had also been committed by another brother in Dallas.

After Jeffrey returned to Tennessee, he and the defendant worked together hanging dry wall and doing roofing work, and, according to Jeffrey, "He was getting crazier." His description of the defendant, was,

> .. one day he was just like a normal person, you know, carry on a normal conversation, you know.... He would come

> to work and a lot of days he wouldn't say nothing, not nothing ... He was just weird, a weird person.

He also testified that when the defendant was "on his medicine," he would work, go home, and sleep without taking a bath, but "he seemed to think better."

The defendant's only prior criminal conviction was for driving while intoxicated.

The facts of the crime are undisputed. Jeffrey, who was with the defendant on the day of the shooting, testified as follows:

> Q: When is the last time that you saw your brother, Jeff, before your Mom died?
>
> A: It was—I bought a bed—I bought a truck and I had bought a bed off of a first cousin of mine, and me and Donnie that day was going over to his house to take the old bed off of my truck, to get it in the process of putting the new one on, and I knowed that he was off of his medicine, you know, and I knowed that he would really get mad if I confronted him with it. So, I kindly told a story while we was on our way over there. I told him, I said, Donnie, Overlook called and told me or told Debbie that you was off your medicine.
>
> Q: Debbie was your wife?
>
> A: Yeah. And, he was cussing her and stuff. And, saying things you know, I didn't like for him to say and me and him about got in a fight and we was up at the garage at that time away from the dump and there was mud like a foot and a half to two foot deep in places, and it had been raining and stuff and we was walking from the garage up there me and my brother, back to get the truck. Boy, he was talking crazy. He was saying, I bet you can't crawl in that mud so far, you know, just crazy stuff.
>
> Q: When did you all part on that day? When did Donnie go his way and you go your way?
>
> A: It was about, I believe, no more than three to four hours before he killed her. I went home and got a phone call and went to the store and people come running out from the store....
>
> . . . . .
>
> I called my mother and told her to lock ... the doors and close the doors 'cause he was crazy and he had a gun, and as soon as I got done with my business, ... I'll be right there and we'll get something done about it. I went home and they called me and it was too late.

Around noon on the day of the crime, Jeffrey's wife had called Overlook Mental Health Center and asked whether the defendant had been receiving his medication. Later that day, the defendant walked into Overlook Mental Health Center and told a person there to stop calling his brother and telling him that he was not taking his medicine.

After leaving Overlook, he went to his cousin Gary Sparks' motorcycle shop where he bought a pistol from Jimmy Swiggett. He was drinking and was "high" but not "drunk." He and Swiggett left the shop for about an hour, during which time the defendant purchased a box of ammunition and test fired the pistol. The defendant provoked a quarrel with another man in the shop and a fight between them was avoided by the intervention of his cousin. Gary Sparks described the incident as follows:

> [The defendant] just grabbed [Shan's] cap [and smacked him in the face], and I think he done it more or less acting a fool, but it was more or less, violent like, you know. It wasn't just goofing off like he usually does.... He was happy for a while and then he got kind of violent like, you know, when he started to smack Shan with that cap, and after I told him he couldn't do that, then he just calmed down.

Around 5:30 that afternoon, the stepfather, Don Taylor, came home from work. After talking with his wife, he locked the door in order to keep the defendant out of the house, and went to his barn to feed his hogs. Around 6:00 p.m., the defendant came to the barn. Taylor testified that,

> He said, Don, I killed Mama.... I said, Donnie, you didn't. He said, I'm not kidding. He said, we'd better go call the law.... We started toward the house and going up there, I said, why, Donnie, why? And he said, she messed with me one too many.... We [went] up the stairs, I went

in and looked in the living room and saw Jody, blood coming out of her. And, he said—he said, what's that number, 911? And, I said, yeah, Donnie they'll get somebody.

The defendant called 911. Taylor checked the victim for a pulse, and then, "panicked and ran." Taylor described the defendant as being "very calm" at this time. Jo Ann Taylor had been shot four times.

Officers Larry Winters and Joe Godfrey, who responded to the 911 call, arrived at the Taylor residence at about 6:56 p.m. Winters testified that they were near the trailer when the defendant stepped out of the trailer and "asked us if we were having a good day," and that,

> Officer Godfrey questioned him, did you call 911, and did you need some help out here. He seemed to be very calm and responded, yes, I need some help.
>
> . . . . .
>
> ... And, he said, I just had shot my Mom and she's over there with a nod of his head....
>
> . . . . .
>
> ... as he started to step off the porch, he stated to the fact, I had to do it, she got under my skin. That is not a quote but it was to that effect, that she got under his skin.
>
> ... At the point between the house and trailer, probably halfway between, Mr. Sparks stopped ... and looked at myself and he said that I raise hogs. He said, would you like to go see my hogs first?

When asked, "What was his demeanor when he said that?," Winters replied, "Very calm."

The officers and the defendant walked into the house where they saw the victim slumped in a chair with blood "splattered." Winters testified that the defendant said, "Do you think she's going to be okay or do you think she's dead?" The defendant was then handcuffed, read his *Miranda* rights, and placed in Winters' cruiser.

Dale Gourley, the chief detective for the Blount County Sheriff's Department, arrived around 7 p.m., and Detective Jim Widener arrived a few minutes later. When Winters went to the car to check on the defendant, he said,

> something to the effect that let's just get out of here, I did it, you know I did it. Just go ahead and take me to jail. Don't leave me sitting in here.

The defendant was transported to the jail where a blood test was performed. The test showed a blood ethyl alcohol content of 0.10 grams and a negative finding for basic drugs.

At approximately 12:30 a.m., detectives Gourley and Widener, after again advising the defendant of his *Miranda* rights, conducted a videotaped interview with the defendant. Review of the videotape shows that during the interview the defendant appeared slow and sedate, and occasionally giggled. Some statements and responses to questions were essentially reasonable, but his answers to other questions were not sensible. For example:

> Q: ... What was your mama doing when you shot her?
>
> A: She's sitting on a couch, on a chair
>
> Q: Was she saying anything to you?
>
> A: Ah, she did asked what I had in my back pocket, I told her its a gun, it mighta accidently went off, I don't know
>
> Q: How many times did you shoot her?
>
> A: Three at least
>
> . . . . .
>
> A: She just put both her hands, screamed, blood came out of her head.
>
> Q: Keep shooting her? (Sparks shakes head no) Shot her three times?
>
> A: I don't know, I really didn't hurt her too bad though.

Detective Gourley testified that after the interview,

> I made the comment to him, I said, Donnie, you are not crazy. I said, I think you are just trying to build a defense. And his reply was, you can't blame a man for trying.

The witnesses Jeffrey Sparks, Don Taylor, Vickie McMurray, Gary Sparks, and Jim Widener testified with regard to the defendant's mental condition at the time the offense was committed, as well as to their

knowledge of the defendant and the facts and circumstances of the crime. The defendant's objection to Widener's opinion testimony was overruled by the trial judge.

Jeffrey Sparks testified that he thought that his brother did not understand the wrongfulness of his act, and that he was unable to help himself with regard to the homicide. He further testified:

> I don't believe he had any knowledge of what he did. He loved his Mom, you know.

The stepfather, Don Taylor, testified that he thought the defendant was "right" in the head.

The jail nurse, Vickie McMurray, testified that the defendant did not act unusual on the night that he was arrested, but she also stated that she had seen the defendant talk to nonexistent people in a corner of his cell and in the shower, and he would act "threatening" when he was not taking his medicine:

> When he's not taking his medication he's either awake, talking continuously or he has this blank stare.

She repeated that when he was on his medication he was fine, but when he was off of it, she was afraid of him.

Gary Sparks, the defendant's cousin, testified,

> A: The biggest part of the time Donnie was the easiest going fellow you'd ever want to talk with.
>
> Q: And, if he does get violent, he does it quick like that?
>
> A: Yeah, usually he just goes off a little there.

When asked, "Is it your opinion that he suffered from a mental illness?", he responded: "I ain't got no way to tell whether he's mentally ill or not."

Detective Widener, one of the officers who investigated the case, stated that, in his opinion, the defendant knew the wrongfulness of his act and could conform his conduct to the requirements of the law. Detective Widener had graduated from high school, he was working on a Bachelor's Degree in criminology through a correspondence course, and he had taken some psychology courses. He based his opinion regarding the defendant's mental condition upon his observation of the defendant while he was being interviewed by Detective Gourley, and upon the fact that the defendant had called 911, he had waited for the officers at the scene of the crime, and he had told them how the crime was committed.

Three state-employed experts testified regarding the defendant's mental condition at the time of the shooting.

The State requested that Dr. Abraham Brietstein, a clinical psychologist, evaluate the defendant for the purpose of formulating an opinion as to his sanity at the time the offense occurred. Dr. Brietstein's testimony and opinion were based on three two-hour appointments with the defendant, a test given to the defendant, conversations with the defendant's family members, and a review of the records of previous psychological evaluations. Dr. Brietstein stated that the defendant had schizophrenia, a serious mental illness. He testified:

> Q: Did you reach an opinion as to whether Mr. Sparks appreciated or understood the wrongfulness of his act in killing his mother?
>
> . . . . .
>
> A: That he, in fact, did not appreciate the wrongfulness of his act. That his mind was too disordered at the time, that he was too confused, that he was operating more on the basis of delusional thinking than on the basis of conventional reality and that therefore, he could not appreciate the wrongfulness of his actions.
>
> . . . . .
>
> A: That, in fact, he was not malingering. That he did truly have a serious mental illness, schizophrenia. That this was a long standing problem, not just a recent problem. That, he in fact, had employed [sic] ten or more years, that he was psychotic at the time the offense occurred and that he in fact was still psychotic, approximately one year later when I evaluated him.
>
> Q: Do you find that Mr. Sparks is a good evaluator of his own mental condition?

A: I don't think he's in good enough contact with reality to have a good sense of his own mental condition. I don't think he has very good insight.

. . . . .

A: I think Mr. Sparks is capable of remembering things and in fact, in the history I took, he did remember things and provided a history of events in his life, but his understanding of that is very distorted and it's distorted by the—by the quality of thinking that he has. So, I think he can remember events but he remembers those in a distorted fashion.

. . . . .

Q: Now is there anything inconsistent with the diagnosis of schizophrenia or his being unable to appreciate the wrongfulness of his act, with him being able to carry on what may at times seem to be a rational conversation?

A: No, there isn't. I think that schizophrenics often can be lucid at one moment and very confused and very disorganized and very lucent [sic] in their thinking another moment. So I think there is a lot of variability there from one moment to the next and very rare is it except in the most acute form of the illness that one is entirely at all moments out of touch with reality.

In response to cross-examination, Dr. Brietstein testified that it would not be inconsistent with his diagnosis for the defendant to state—I'll spend less time in a mental hospital than in jail, to calmly discuss the events of the shooting shortly after it happened, or to purchase the gun and then go home and shoot his mother.

Dr. Jackson B. White, IV, a psychiatrist, who is the clinical director at Middle Tennessee Mental Health Institute (MTMHI), testified that pursuant to a court order he did a forensic evaluation on the defendant three months after the killing. For that purpose, the defendant was at MTMHI for 58 days. The evaluation was performed by a team consisting of a psychiatrist, a psychologist, a social worker, and a nurse, and was based on constant observation, testing, interviews, prior psychiatric medical reports, and background information. The purpose of Dr. White's evaluation was to determine if the defendant was mentally ill, and if so, "how he was functioning at the time of the incident." He diagnosed the defendant's illness as chronic, undifferentiated type, schizophrenia. He testified that in his opinion, the defendant had a psychotic break in 1981; he defined a psychotic break as losing contact with reality. He concluded from the evaluation that the defendant could not appreciate the wrongfulness of the act of killing his mother. When asked whether the defendant could substantially conform his conduct on June 12, 1990 to the requirements of the law, he testified, "It was our impression that his behavior was outside of his control."

Dr. White testified that the defendant was seen by a Dr. Bursten two days after the episode and that Dr. Bursten described the defendant as being quite ill, and he doubled the defendant's dosage of Haldol from 50 milligrams to 100 milligrams. When asked if he could be malingering, Dr. White testified that his tests and observations would expose malingering, and that

> it stretches my credulity to believe that he would malinger and take these extremely potent medicines for up to ten years so that he could kill his mother on the morning of—in June of 1990.

Dr. Samuel Craddock, a clinical psychologist with a doctorate in psychology, who was also part of the forensic team at MTMHI, testified that he considered the records from the defendant's prior hospitalizations in Dallas and Georgia, as well as the records from the Overlook Mental Health Center, the video taped interview with the defendant, and transcripts of interviews with individuals who were with the defendant on the day of the shooting. He performed psychological tests on the defendant and spent the "better part of the day" with the defendant on seven separate days. He also saw the defendant at the Cockrill Bend Facility where he was detained before trial. Dr. Craddock expressed the opinion that the defendant was psychotic[1] and schizophrenic and was not

1. Mr. Craddock defined "psychotic" as being out of touch with reality or having marginal touch

attempting to give a distorted impression of himself. He testified,

> that we felt as though that it was not only current while we saw him, that the information we had existed at the time of the alleged assault that led to his arrest and that we were willing to support an insanity defense from the information that had been supplied us.

He also testified that the statement "you can't blame a man for trying" indicated that the defendant was not malingering because, "if he wanted to portray himself as being mentally ill and had a rational thought process, he would not make such a statement that would be rather convicting or self-incriminating." He further testified,

> I think the mental illness substantially impaired his ability to appreciate the wrongfulness of the act.... I felt that his ability to conform his conduct was also substantially impaired.... [At the time of the offense, his medication had been reduced to the] lowest point that it had been for months or perhaps years.

## II

The defendant insists that Detective Widener's lay opinion testimony was not admissible. Consequently, the first issue is whether the trial judge erred in allowing Widener to express the opinion that at the time the offense was committed the defendant "knew the wrongfulness of his act" and "was capable of conforming his conduct to the requirements of the law." The Court of Criminal Appeals found the trial court properly allowed Detective Widener to state his opinion, apparently finding that the officer's observations of the defendant's actions and conduct were a sufficient basis on which to express an opinion regarding his mental condition.

The determination of the admissibility of Detective Widener's testimony begins with the Tennessee Rules of Evidence, which became effective January 1, 1990. Rule 701, Opinion Testimony by Lay Witnesses, provides:

> (a) Generally. If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences where:
>
> (1) The opinions and inferences do not require a special knowledge, skill, experience, or training;
>
> (2) The witness cannot readily and with equal accuracy and adequacy communicate what the witness has perceived to the trier of fact without testifying in terms of opinions or inferences; and
>
> (3) The opinions or inferences will not mislead the trier of fact to the prejudice of the objecting party.

This rule essentially incorporated existing Tennessee law. Prior to the adoption of the Rules, lay opinion evidence was allowed "where a proper foundation for the expressing of an opinion [was] laid." *Edwards v. State,* 540 S.W.2d 641, 646 (Tenn.1976), *cert. denied,* 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 777 (1977). The rationale for retaining the prior law, which is different from the federal rule, has been stated as follows:

> Tennessee has traditionally limited the use of lay opinions. In order to have any probative value, an opinion must be based upon a factual predicate found in facts admissible in evidence. It is easier for the trier of fact to assess the reliability and accuracy of a witness' testimony about observed facts than a lay witness' testimony relating an opinion.
>
> . . . . .
>
> The policy underlying the Tennessee tradition of limiting the admissibility of lay witnesses' opinions is indicative of the need to preserve the fact-finding role of the jury. The traditional rule, that it is "the function of the witness to state the evidentiary facts and the function of the jury to draw such conclusions as the facts warrant," is preserved under the newly adopted rules.
>
> * * * * * *

with reality and having difficulty making accurate interpretations of what was going on in one's surroundings.

The new rules generally follow the federal rules format with only two exceptions. Rules 701 and 706 maintain the common law distrust of the layperson's ability to remain objective in their out of court conclusions and of the judge-designated expert.

J. Houston Gordon, "The Admissibility of Lay and Expert Opinions," 57 *Tennessee Law Review* 103, 104, 114 (1989) (footnotes omitted).

With regard to subsection (a)(1) of the rule, that only those "opinions and inferences [which] do not require a special knowledge, skill, experience, or training," are admissible, the authors of *Tennessee Law of Evidence* state:

> Tennessee law permits a lay witness to testify regarding the insanity of an individual if a factual foundation is laid that is sufficient to justify the lay opinion and to give it credibility.

Cohen, Paine & Shepherd, *Tennessee Law of Evidence,* § 701.4, (2d ed. 1990) (citing *Edwards v. State,* 540 S.W.2d 641 (Tenn.1976), *cert. denied,* 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 777 (1977)). To be reliable, a lay opinion regarding sanity must be based on the knowledge of facts which reflect the person's mental condition.

Consequently, observation by a lay witness for a short period of time rarely can constitute a reliable foundation for the expression of an opinion about the mental condition of the person observed. On the other hand, a household member, a near neighbor, a close friend, a fellow worker, anyone who is well acquainted with the person observed, probably will have sufficient knowledge on which to express a reliable opinion.

The second requirement of Rule 701 is:

> (2) The witness cannot readily and with equal accuracy and adequacy communicate what the witness has perceived to the trier of fact without testifying in terms of opinions or inferences; ...

The Advisory Commission comments address this provision of the rule as follows:

> The rule rather specifically circumscribes the area where a lay witness can testify to opinions as opposed to facts. The Commission believed that the instances would be rare where a witness could not convey thoughts to the jury by enumerating facts, leaving it to the jurors to draw inferences. In situations where a witness "cannot readily and with equal accuracy and adequacy" testify without an opinion, the witness may state opinions requiring no expertise. Consequently, a lay witness may testify that a person was "drunk" or that a car was traveling "fast."
>
> . . . . . .
>
> As a condition to admitting lay opinions on insanity or another's illness, courts have required a factual foundation....

The symptoms or indicia of sanity or insanity, observable by non-experts in mental health, are the usual activities and personal interactions which can be described readily, accurately, and adequately by a lay witness without resort to the expression of an opinion.

The third condition for the admissibility of lay opinion testimony is that it "will not mislead the trier of fact...."

Tested against the standards of Rule 701, the opinion testimony by Detective Widener that the defendant in this case knew the wrongfulness of his conduct and could conform his conduct to the law was not admissible. The sole basis for Detective Widener's opinion was his observations of the defendant over a short time period while he was in custody. Those observations were adequately communicated to the court and jury by the witness in testimony other than the expression of his opinion. Detective Widener was in no better position to draw a conclusion from these observations than were the members of the jury. Even under the comparable federal rule of evidence which merely requires that the lay opinion be based on the perception of the witness and be helpful to the jury, it is recognized that "assertions which amount to little more than choosing up sides," should be excluded as unhelpful to the jury. Fed.R.Evid. 701 advisory committee's note; *see also* McCormick on Evidence 43–45 (John William Strong ed., 4th ed. 1992). The very limited observation of the defendant's

conduct made by the witness was not a sufficient foundation on which to base an opinion of sanity. Consequently, the trial court erred in allowing Widener to give opinion testimony.

If the admission of the officer's opinion testimony were the only error in the record, that error would be tested according to Rule 36(b), Rules of Appellate Procedure, to determine if the error more probably than not affected the jury verdict. *See* Tenn. R.Crim.P. 52. However, since the evidence is not sufficient to support the jury verdict, requiring that the case be reversed and remanded, harmless error analysis is not necessary.

III

With regard to the sufficiency of the evidence, the Court of Criminal Appeals found that,

> there was proof consistent with sanity. The appellant purchased the gun and ammunition for the gun on the very day of the killing. The nurse at the jail stated that he appeared to be normal at the time she saw him on the night of the killing. The detective who saw him several hours after the murder testified that the appellant knew right from wrong and that he did not see anything which indicated that the appellant was insane. Finally, the appellant told the investigating detective that he was trying to build an insanity defense and one could not blame him for trying to do so. Furthermore, there was proof from the records at Overlook that the appellant had received the monthly injection of his medication about three weeks before the killing and that he was doing well at the time.
>
> While certainly not overwhelming, there was sufficient proof from which any rational trier of fact could conclude beyond a reasonable doubt that the appellant was sane at the time that he killed his mother.

Rule 13(e) of the Tennessee Rules of Appellate Procedure provides that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." In *State v. Smith*, this Court summarized the standard of review for a jury verdict as follows:

> A jury verdict approved by the trial judge accredits the testimony of the witnesses for the State and resolves all conflict in favor of the State's theory. On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. A verdict against the Defendant removes the presumption of innocence and raises a presumption of guilt on appeal, which the Defendant has the burden of overcoming.
>
> . . . . .
>
> When the sufficiency of the evidence is challenged, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*State v. Smith*, 868 S.W.2d 561, 568–69 (Tenn.1993), *petition for cert. filed* (Apr. 4, 1994) (citations omitted).

Insanity at the time an offense is committed is an absolute defense. The current standard for sustaining a plea of insanity was first set out in *Graham v. State*, 547 S.W.2d 531, 543–44 (Tenn.1977), now codified in section 39–11–501(a) (1991) of the Tennessee Code Annotated:

> Insanity is a defense to prosecution if, at the time of such conduct, as a result of mental disease or defect, the person lacked substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform that conduct to the requirements of law.

Because a defendant is presumed to be sane, the defendant has the initial burden of showing that sanity is an issue. However,

> If the evidence adduced either by the defendant or the State raises a reasonable doubt as to the defendant's sanity, the burden of proof on that issue shifts to the State. The State must then establish the defendant's sanity to the satisfaction of the jury and beyond a reasonable doubt.

*Graham v. State,* 547 S.W.2d at 544. "Sanity thus becomes an element of the crime." *State v. Clayton,* 656 S.W.2d 344, 346 (Tenn. 1983); *Stacy v. Love,* 679 F.2d 1209, 1213 (6th Cir.), *cert. denied,* 459 U.S. 1009, 103 S.Ct. 364, 74 L.Ed.2d 400 (1982).

In this case, the record shows, and the State acknowledges, that the proof established that the defendant had a "mental disease or defect" at the time he committed the crime and that such evidence raised a reasonable doubt as to the defendant's sanity and shifted the burden of proof to the State. Consequently, in order to prevail, the State had the burden of proving the defendant was capable of appreciating the wrongfulness of his conduct and conforming his conduct to the requirements of the law. *See State v. Patton,* 593 S.W.2d 913, 915 (Tenn.1979); *Edwards v. State,* 540 S.W.2d 641, 646 (Tenn. 1976), *cert. denied,* 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 777 (1977).

The determination of the defendant's sanity at the time of the crime was a question of fact for the jury upon consideration of all the evidence. All the expert testimony in the case supports both grounds for finding insanity—the defendant's inability to appreciate the wrongfulness of his act, and his inability to conform his conduct to the law. The State insists that, nevertheless, the lay evidence in the record adequately supports the jury's finding that the defendant was sane beyond a reasonable doubt. The State is not limited to expert testimony in proving the defendant was sane. The State's burden of proving insanity,

> can be met by the state through the introduction of expert testimony on the issue, or through lay testimony where a proper foundation for the expressing of an opinion is laid, or through the showing of acts or statements of the petitioner, at or very near the time of the commission of the crime, which are consistent with sanity and inconsistent with insanity.

*Edwards v. State,* 540 S.W.2d at 646. In making its determination, the jury is allowed to consider both lay and expert testimony as evidence, and it may discount expert testimony which it finds to be in conflict with the facts of the case.

> In this state, "it is settled beyond question that the weight and value of expert testimony is for the jury and must be received with caution." *Mullendore v. State,* 183 Tenn. 53, 191 S.W.2d 149 [ (1945) ]. This applies to the expert opinions of medical men. *Crane Enamel Co. v. Jamison,* 188 Tenn. 211, 217 S.W.2d 945 [ (1948) ]. Where there is any conflict between expert testimony and the testimony as to the facts, the jury is not bound to accept expert testimony in preference to other testimony, and must determine the weight and credibility of each in the light of all the facts shown in the case.

*Id.* at 647.

All three experts relied on extensive reports and examinations. All three experts testified that the defendant suffered from schizophrenia when he was examined, and, in the opinion of each, he was psychotic at the time the crime was committed. Each of the three experts also expressed the opinion that the defendant was not malingering, and each testified that the defendant's statement to Detective Widener, that "you can't blame a man for trying," was not inconsistent with the finding of insanity. The experts' description of the behavior associated with schizophrenics is consistent with the defendant's actions and demeanor before and after the commission of the crime. Their testimony established that all of the defendant's actions, from his calm demeanor to his erratic temper, and even the unprovoked killing of his mother, were consistent with schizophrenia.

In addition to the testimony of the expert witnesses, the testimony of the defendant's brother and cousin support the plea of insanity, leaving only the testimony of the victim's husband, the jail nurse, and a police officer.

In summary, the State relies upon the following facts, opinions and statements as evidence that the defendant was sane at the time of the offense: the facts that the defendant had received his monthly injection of medication, the defendant bought the pistol and ammunition with which the crime was committed, he appeared to be calm after the crime, he called 911 and he was able to remember the events of the crime; the step-

father's opinion that he had never felt the defendant was mentally ill; the statements made by the jail nurse that the defendant did not act unusual on the night that he was arrested, by Detective Widener that the defendant "acted" as if he knew the wrongfulness of his act and could conform his conduct to the requirements of the law, and by the defendant that "you can't blame a fellow for trying."

This review shows that the evidence relied upon by the State to prove that the defendant was sane was not sufficient. As stated previously, the State's burden may be met by expert testimony, lay testimony based on a proper foundation, and evidence of conduct consistent with sanity and inconsistent with insanity. In this case there was no expert testimony in support of the defendant's sanity. The lay opinion of the police officer was not supported by an adequate foundation, and even though the record contains evidence of acts and statements of the defendant which are consistent with sanity, they are not inconsistent with insanity. *See State v. Edward Jackson,* 890 S.W.2d 436 (Tenn. 1994); *Edwards v. State,* 540 S.W.2d at 647. The evidence, therefore, does not support the jury's finding that the defendant was sane at the time the crime was committed.

Because the State failed to prove the defendant's sanity beyond a reasonable doubt, the conviction is reversed, the defendant is found not guilty by reason of insanity, and the case is remanded to the trial court for proceedings pursuant to T.C.A. § 33–7–303 (Supp.1993).

All other issues are pretermitted.

Costs are assessed against the State.

ANDERSON, C.J., DROWOTA, and BIRCH, JJ., and O'BRIEN, Special Judge, concur.