IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
JANUARY SESSION, 1996

FILED

March 25, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

STATE OF TENNESSEE,            )
                               )      No. 02C01-9506-CR-00157
       Appellee                )
                               )      SHELBY COUNTY
vs.                            )
                               )      Hon. BERNIE WEINMAN, Judge
DARREN SMITH,                  )
                               )      (Direct Appeal - Reckless
       Appellant               )      Endangerment and Attempted
                                      Second Degree Murder)


DISSENTING OPINION


        I am unable to join with the majority in concluding that the State's evidence

was insufficient to establish the defendant's sanity beyond a reasonable doubt.  For

this reason, I would reverse the trial court's decision granting the defendant's motion

for judgments of acquittal upon grounds of insanity and would reinstate the jury's

verdict of guilt on all charges.

        I find from the proof that the State has met its burden of establishing the

defendant's sanity through the acts or statements of the defendant, at or very near

the time of the commission of the crime, and that these acts are consistent with

sanity and inconsistent with insanity.  See State v. Sparks, 891 S.W.2d 607, 616

(Tenn. 1995);  State v. Jackson, 890 S.W.2d 436, 440 (Tenn. 1994).

        This case presents a classic example of the tragedies caused by spurned

love.  The theme is neither new nor novel and its ending predictable.  The defendant

and Ms. Moss endured a four year relationship which could be characterized as

turbulent at times.  The defendant's first recorded act of aggression toward Ms.

Moss occurred in 1991.  On this occasion, the two had argued and Ms. Moss had

ordered the defendant to leave her home.  The defendant, however, returned to her

home where he broke out windows, resulting in injury to Ms. Moss, and forced his

way into her home.  The internal affairs office was assigned this investigation and,

as a result of their report, the defendant received a two day suspension. Other complaints followed. Finally, in April 1993, Ms. Moss ended the relationship. Ms. Moss testified, "He was very angry with me for breaking up." Shortly thereafter, she began dating another police officer. The defendant began making threats to Ms. Moss. He was repeatedly told not to come to her home. These requests were ignored. On one occasion, he again entered her home uninvited and confronted Ms. Moss' friend which resulted in a physical confrontation between the two. On June 4, 1993, the date of the instant offenses, the defendant made three uninvited visits to the victim's home and had called her by telephone ten to fifteen times. On the first visit, the defendant delivered to Ms. Moss a torn-up credit card statement which the two had been arguing about. On the second visit, the defendant brought some flowers. Ms. Moss called the police who were en route when the defendant left. On the third visit, he returned to Ms. Moss' home armed with a 12 gauge shotgun loaded with slugs. During this visit, he fired four rounds into various windows in her home terrorizing the children and narrowly missing Ms. Moss and her male friend. Additionally, on this last visit, the defendant, upon entering Ms. Moss' driveway, struck her friend's car with his truck.

Following this episode of terror, the defendant returned to his mother's residence where the record suggests that he called the police. Upon arrival of the police, the defendant advised the responding officer, "that he had shot into Ms. Laura Moss' house." The officer testified, "I asked Mr. Smith with what. He advised me a shotgun. I asked him where was it. He told me it was in the back room." The shotgun was recovered from under the bed and the defendant was arrested.

The defense called, as an expert witness, Dr. Freeman, his attending psychiatrist. Dr. Freeman's testimony proved interesting and the following portions are particularly noteworthy.

> **Dr. Freeman**: He [defendant] was suffering from a mental condition at that time.

> **Defense Counsel**: Okay. And how would you term that in layman's terms?

2

**Dr. Freeman**: Temporary insanity is how we would describe it in layman's terms.

**Defense Counsel**: [D]id Mr. Smith lack substantial capacity to appreciate the wrongfulness of his actions?

**Dr. Freeman**: I would say so, that is a possibility.

**Prosecutor**: . . . Now as a qualified professional, can you tell me at what point he became temporarily insane?

**Dr. Freeman**: . . . I think the act is the point. The act of the shooting was the point of being insane.

**Prosecutor**: Are you saying that if he had not done that (shooting) that he would not have been insane?

**Dr. Freeman**: Well, I mean that's hard to say. I mean, I can say that a particular act is an insane act. Now, whether one has seeming insanity underneath throughout that time, I can say yeah.

**Prosecutor**: Now, you mentioned that he was depressed . . . isn't it possible . . . part of the reason about his depression were (sic) the fact that he had been arrested and was facing criminal charges?

**Dr. Freeman**: That could be part of the constellation of responses.

Additionally, the psychiatrist testified that a 1993 physical injury to the defendant's head "was a large factor" in forming his opinion that the defendant was "temporarily insane" at the time of the shooting. After being advised by the prosecutor that the defendant was committing acts of aggression against Ms. Moss in 1991, two years before he received the head injury, the question was then asked whether this fact would "have any effect on your opinion" as to insanity. Dr. Freeman replied, "That would strengthen my diagnosis."

Finally, it is observed that Dr. Freeman testified that it was possible that the defendant was insane in 1991 and again in 1993, however, it cannot be ignored that, during this same period, the defendant was performing his duties as a Memphis police officer and receiving special commendations for his work.

Once raised, the issue of a defendant's sanity is a question for the jury to resolve. See Spurlock v. State, 368 S.W.2d 299 (Tenn. 1963); see also Tenn. R. Crim. P. 29(a). Notwithstanding the jury's ultimate responsibility in making the sanity determination, there are at least three points during the trial when the trial court

3

must determine whether the evidence is sufficient as a matter of law. First, the trial court must determine whether the defendant has presented sufficient evidence to put his sanity at issue. Second, the court must determine whether the State's rebuttal evidence is sufficient to make an issue for the jury on the defense of insanity. Third, in the event of a guilty verdict, the court must decide whether the State's evidence is sufficient to support the conclusion of the trier of facts as to the defendant's sanity at the time of the offense. See United States v. Collier, 453 F.2d 1173, 1176-1177 (5th Cir. 1972).

In the present case, I would concede that the defense did, albeit narrowly, present sufficient proof to create a reasonable doubt as to the defendant's sanity. See Sparks, 891 S.W.2d at 615. The next question is whether the State sufficiently presented evidence to rebut the defendant's claim of insanity to warrant the jury's consideration on the issue of sanity. Although both the kind and quantum of evidence presented by the State in rebuttal are important, the nature and quantum of evidence necessary to raise a jury question is determined in relation to the strength of the defendant's case for insanity. See United States v. McCracken, 488 F.2d 406, 409 (5th Cir. 1974). Thus, although the presentation of rebuttal expert testimony is preferred, it is possible for the State to meet its burden without relying upon expert testimony. Indeed, the State may sufficiently counter defense expert testimony:

> by showing the incorrectness or inadequacy of the factual assumption on which the opinion is based, 'the reasoning by which he progresses from his material to his conclusion,' the interest or bias of the expert, [and] inconsistencies or contradictions in his testimony as to material matters. . . .

Mims v. United States, 375 F.2d 135, 143-144 (5th Cir. 1967).

Apparently this is the route chosen by the State in the present case. The State, in an effective cross-examination of the defense's expert witness, amply revealed the inaccuracies, the inconsistencies, and the incompleteness of Dr. Freeman's diagnosis. Although no expert witnesses were presented in rebuttal, the State's

cross-examination of Dr. Freeman sufficiently rebutted the defendant's proof so as to create a jury question as to his sanity.

Once the issue of sanity is presented to the jury, the jury is allowed to consider both lay and expert testimony as evidence, and it may discount expert testimony as evidence which it finds to be in conflict with the facts of the case. Sparks, 891 S.W.2d at 616. Thus, the jury is free to weigh the relative strength of lay testimony against the relative weakness of expert testimony in arriving at their verdict. In reviewing the evidence, as we are required to do, in the light most favorable to the State, I find the State has met its burden and this case was properly submitted to the jury.

There is no evidence in the record of mental illness of the defendant prior to the commission of these crimes or afterward.[1] Following four years in the U.S. Marine Corps, he became a Memphis police officer during which time he had received commendations for his service. The evidence at trial established that the defendant's action in attempting to murder his ex-girlfriend and her current boyfriend was motivated by anger and jealousy. The defendant had previously made threats against his victims and, on this occasion, the jury could have rationally inferred that he armed himself with the intent of carrying out these threats. His conduct was consistent with previous acts of aggression. Although at trial the defendant related amnesia as to the shooting, his admission to the arresting officer stands unrefuted. I find these acts totally consistent with sanity and inconsistent with insanity. For these reasons, I would affirm the jury's verdict.

_____
DAVID G. HAYES, Judge

_____

[1] The record further establishes that, on December 15, 1994, the defendant was found not guilty by reason of insanity with judicial hospitalization ordered. On April 13, 1995, the defendant was found competent by his treating psychiatrist, Dr. Freeman, and released.