IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 22, 2018 Session

## STATE OF TENNESSEE v. MATTHEW MARSHALL

**Appeal from the Criminal Court for Bledsoe County**
**No. 2012-CR-38      Buddy D. Perry, Judge**

_____

### No. E2017-01933-CCA-R3-CD

_____

A Bledsoe County jury convicted the Defendant, Matthew Marshall, of attempted rape and attempted aggravated statutory rape. The trial court imposed consecutive ten-year and four-year sentences, respectively, for a total effective sentence of fourteen years. At his motion for new trial, the trial court amended the judgments to run the sentences concurrently, for an effective ten-year sentence. On appeal, the Defendant contends that the trial court made numerous evidentiary errors when it admitted certain statements or testimony as evidence and when it allowed several witnesses to testify. After a thorough review of the record and relevant authorities, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS, P.J. and, THOMAS T. WOODALL, J., joined.

Edward L. Boring, Pikeville, Tennessee for the appellant, Matthew Marshall.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; James Michael Taylor, District Attorney General; Will Dunn, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I.   Facts

This case arises from the Defendant having sexual contact with his neighbor, a thirteen-year-old female victim. A Bledsoe County grand jury indicted the Defendant for rape and aggravated statutory rape.

## A. Trial

At the Defendant's trial on these charges, the following evidence was presented: The victim testified that she was thirteen-years-old at the time of these events and living with her mother and her mother's boyfriend in a mobile home; her grandmother lived in a mobile home on the same property. The Defendant and his wife lived next door in another mobile home. On their shared property was a barn. The victim testified that she was home-schooled and said that she had known the Defendant since she was six years old. She described the Defendant as being "like a dad" to her, his wife "like a mom," and their kids "like brothers and sisters." The victim and the Defendant's children frequented each other's houses. The victim's mother owned the Defendant's mobile home, which was positioned approximately two feet from her own mobile home, and she allowed his family to live there for free.

The night of the rape, the victim was at the Defendant's mobile home and went frog hunting with the Defendant and his wife and children. The victim later was sitting on the front porch of her mother's mobile home when the Defendant came out of his house and began talking with the victim about "going walking." At some point, the Defendant "motioned" for the victim to go around the back of the mobile homes and into the barn, which she did voluntarily. The victim testified that the barn did not have a door and was open to the elements. At the front of the barn, the Defendant raised the victim's shirt and began kissing her chest and trying to pull down her pants. The Defendant then pulled her to the back of the barn and laid her down on the concrete floor. The Defendant was pulling her shirt up while the victim was attempting to keep her clothes on and yelling at the Defendant to stop. The Defendant then sucked on the victim's breasts and kissed her belly and poked her leg with his erect penis. The victim continued to try and pull her pants up, but the Defendant "pinned [her] arms behind [her] head." The victim kept telling the Defendant "no," but he yanked her pants down and stuck his penis inside her vagina causing the victim to hit her head on the concrete floor. The Defendant then spit on his fingers and rubbed them on the victim's vagina, penetrating her with his fingers. The victim testified that she felt "scared and terrified."

The victim testified that it "hurt" and "stung" badly when the Defendant penetrated her and that she was bleeding afterwards and had trouble walking. After the rape, the Defendant asked the victim, "Are you going to tell on me?" and the victim replied that she would not because she was afraid. After the rape was over, the victim went home and immediately called her father on her cell phone. The victim explained that her mother was at home but asleep, and the victim was afraid if she told her mother, her mother would go to the Defendant's house next door and confront him.

The victim testified that her step-mother, Valerie Wyatt, answered her father's

2

phone when the victim called. The victim told Ms. Wyatt that the Defendant had raped her. Ms. Wyatt told the victim "don't move" and promised that she and the victim's father were coming to get her. The victim waited and was crying. Ms. Wyatt and the victim's father arrived forty-five minutes later; in the interim, they had called the victim's grandmother, and she and the victim's grandfather had come to the victim's mobile home The victim told her grandmother that the Defendant had raped her. The victim continued crying and screaming. The victim testified that, as she told her grandparents what happened, she felt shocked, hurt, and scared.

The victim went to the hospital where she gave a statement to a nurse. A physical examination revealed that her vagina was swollen and red and that she had a rash. The victim stated that she had not had sexual intercourse before this event. The victim stated that hospital staff swabbed her breasts and the outside of her vagina for DNA; the inside of her vagina was too swollen for a swab to be taken. The victim described the pain in her vagina as "really, really bad" and stated that she could not tolerate a vaginal exam.

On cross-examination, the victim testified that she did not scream while the Defendant was raping her because she was afraid and because he was telling her to be quiet. She agreed that none of her clothing was stretched out as a result of the incident and that she did not have any marks on her body from being on the concrete floor.

Valerie Wyatt, the victim's step-mother, testified that she was with the victim's father when the victim called his phone. Ms. Wyatt answered the victim's call, and she described the victim as "crying her eyes out" and screaming that she had been raped and that she wanted Ms. Wyatt and her father to come get her. Ms. Wyatt asked the victim who had raped her, and the victim replied with the Defendant's name. Ms. Wyatt knew the Defendant and that he lived next door. The victim's exact words to Ms. Wyatt were, "He's not going to stop. He says it wasn't over, Val. He's going to kill me." Ms. Wyatt immediately drove to the victim's home and found her in the bedroom still upset from the incident. Ms. Wyatt said the victim was crying and screaming and blaming herself for the incident. Ms. Wyatt put the victim into her truck to take her to the hospital. As this occurred, the victim's father hit the Defendant, who had told the victim's father that he was sorry.

Ms. Wyatt described the victim's emotional and physical state as they drove to the hospital: "She was still very upset, crying, jerking all over. Her whole body was red. Her hair was just everywhere." Ms. Wyatt said the victim had straw in her hair.

Susan Smith testified that she was the victim's grandmother and lived behind the victim's home with a hay barn in between the two homes. On the evening of the incident, Ms. Smith was inside her home when she got a call from the victim's father. She went to

the victim's home where she found the victim hysterical and "in shock." Law enforcement arrived, as well as the victim's father who started fighting with the Defendant. The Defendant told the victim's father he was sorry. The victim eventually told Ms. Smith that the Defendant had raped her in the barn, so Ms. Smith took pictures of the barn area.

The victim's father testified that he was at home the night of the incident; the victim had been staying with him and Ms. Wyatt for several weeks leading up to the incident. The victim's father overheard the victim's phone conversation with Ms. Wyatt; the victim was screaming into the phone that she had been raped. He described the victim as sounding "distraught" and screaming and crying. As he prepared to go to the victim, Ms. Wyatt told him that the Defendant had raped the victim. On his way to the victim's house, the victim's father called his mother. The victim's father arrived at the same time as law enforcement. The victim's father confronted the Defendant and hit him while the Defendant said he was "sorry." The victim was screaming, crying and "irate."

The victim's mother testified that she had a medical condition requiring her to take prescription pills to help her sleep which makes her a "hard sleeper." She testified that the victim lived with her and that her boyfriend was spending the night on the night of the incident. She had taken her medication that night and agreed that she would have been difficult to arouse from sleep. She awoke to the victim's grandmother knocking on her door looking for the victim. The victim's mother described the victim as crying and upset and "blurted out" that something had happened to her. The victim's mother called the police who arrived approximately forty-five minutes later. The victim's mother recalled that the Defendant said he did not do anything. The victim's mother accompanied the victim to the hospital. The State asked the victim's mother whether the victim had had any medical problems since the rape and, upon the Defendant's objection, the State withdrew the question.

Angela Cherry testified that she worked as a registered nurse at Cumberland Medical Center. Among her multiple roles at work, she served as the hospital's sexual assault nurse examiner. Ms. Cherry examined the victim on the night of the incident; she read aloud for the jury her written notes from the victim's account of the rape, contained in the victim's medical record; the victim's account was consistent with her testimony at trial, including that the Defendant "stuck [his penis] inside" the victim. The victim reported to Ms. Cherry that the Defendant had given her a hickey on her neck, which Ms. Cherry confirmed and noted in the records. Ms. Cherry testified that the victim was unable to tolerate a full vaginal exam because it was painful. Ms. Cherry described the victim as "tearful" with periods of calm.

Ms. Cherry listed the items of evidence she obtained from the victim: a pair of

4

underwear, four vaginal swabs, two breast swabs from each breast, and a blood sample from the victim. Ms. Cherry stated that the victim had a severe rash in her vaginal area that was a possible yeast infection. She stated that intercourse would have been very painful due to the infection. Ms. Cherry stated that she could not say for certain whether or not the victim had sexual intercourse on the night of the examination. The victim told Ms. Cherry she had not had sexual intercourse before.

On cross-examination, Ms. Cherry agreed that she did not note any signs of physical injury on the victim's body. She denied seeing hay in the victim's hair.

Detective Ricky Seals testified that he was the Chief Investigator in Bledsoe County for the sheriff's office and that he investigated this case starting with meeting the victim at the hospital. He obtained custody of the rape kit performed by Ms. Cherry and transported it to the Tennessee Bureau of Investigation ("TBI") for analysis. Detective Seals took a statement from the victim at the hospital which was consistent with her trial testimony. He also obtained a pair of underwear and a shirt from the Defendant.

Mr. Chad Johnson testified that he was a special agent forensic scientist at the TBI and was qualified as an expert in the field of forensic serology and DNA analysis. Special Agent Johnson testified that he tested the evidence in this case for DNA and compared it to DNA from blood samples taken from the Defendant and the victim. The vaginal swab was negative for the presence of semen as was the victim's underwear. The swab from the victim's breast tested positive for the presence of the Defendant's DNA. The Defendant's underwear tested positive for the presence of the victim's DNA.

On cross-examination, Special Agent Johnson agreed that he did not find the presence of semen on any of the items of evidence or on the vaginal swab taken from the victim.

On redirect-examination, Special Agent Johnson agreed that if a prophylactic had been used during the rape, no semen would have been present on the vaginal swab or on other items of evidence. On recross-examination, Special Agent Johnson was asked to clarify whether a prophylactic was in fact used, and the State conceded that one was not used in this case.

Based upon this evidence, the jury convicted the Defendant of attempted rape and attempted aggravated statutory rape. The trial court imposed consecutive sentences of ten years for the attempted rape and four years for the attempted aggravated statutory rape. At the Defendant's hearing on his motion for new trial, the trial court amended the judgments and ordered that the sentences be served concurrently. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant raises multiple issues with regard to the admissibility of testimony or statements made by various witnesses. Generally, "[a]dmission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion." *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004). The Tennessee Rules of Evidence provide that all "relevant evidence is admissible," unless excluded by other evidentiary rules or applicable authority. Tenn. R. Evid. 402. Of course, "[e]vidence which is not relevant is not admissible." *Id.* Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Even relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Evidence which qualifies as "hearsay" is also excluded from admission at trial. Under Tennessee Rule of Evidence 801 , "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." However, there are exclusions to the hearsay rule, which we have detailed in our analysis below. We will address each of the Defendant's issues in turn.

### A. Ms. Wyatt's Testimony

The Defendant first contends that the trial court erred when it allowed Ms. Wyatt to testify about the victim's statements to her during their telephone call. He specifically attacks Ms. Wyatt's testimony that the victim told her: "He says it wasn't over, . . . He's not going to stop. He's going to kill me." The Defendant contends that this is "hearsay upon hearsay" and should not have been allowed without the proper exception, which the Defendant concedes could be the excited utterance exception. The State responds that the portion of the complained-of testimony that qualified as hearsay was admissible pursuant to the excited utterance exception and the statement of a party opponent exception. *See* Tenn. R. Evid. 803(2) and 803(1.2). We agree with the State.

Pursuant to Rule of Evidence 803(2), the hearsay rule does not exclude "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tenn. R. Evid. 803(2). "Underlying the excited utterance exception is the theory that 'circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication.'" *State v. Franklin*, 308 S.W.3d 799,

823 (Tenn. 2010) (quoting *State v. Land*, 34 S.W.3d 516, 528 (Tenn. Crim. App. 2000)). Three requirements must be met for a statement to qualify as an excited utterance:

> The first requirement is a startling event or condition that suspends the normal, reflective thought processes of the declarant. Second, the statement must relate to the startling event or condition. This broad requirement offers considerable leeway such that the statement may describe all or part of the event or condition, or deal with the effect or impact of that event or condition. The third and final requirement dictates that the declarant make the statement while under the stress or excitement from the event or condition. This requirement considers a variety of factors, including the interval of time between the startling event and the statement.

*Id.* (footnotes, citations, and internal quotation marks omitted). The excited utterance exception also has a competency requirement where "the declarant must have had an opportunity to observe the facts contained in the extrajudicial statement." *Land*, 34 S.W.3d at 529. The "'ultimate test'" of whether a statement is admissible within the excited utterance exception is "'spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement or strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication.'" *Franklin*, 308 S.W.3d at 823 (quoting *State v. Smith*, 857 S.W.2d 1, 9 (Tenn. 1993)).

Rule 803(1.2) provides that "[a] statement offered against a party that is . . . the party's own statement in either an individual or a representative capacity" is "not excluded by the hearsay rule." Tenn. R. Evid. 803(1.2). A statement need not be against interest when made by a party opponent to qualify for admission under Rule 803(1.2). The Defendant's statements, both written and oral, are admissible, subject to exclusion only by other rules of evidence. *State v. Binion*, 947 S.W.2d 867, 874 (Tenn. Crim. App. 1996); NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 8.06[3][a] at 8-47 (5th ed. 2005).

Ms. Wyatt's testimony about what the victim said to her during their phone call is admissible pursuant to both of the hearsay exceptions listed above. The evidence was that the victim called Ms. Wyatt immediately following the rape and was screaming and crying according to multiple witnesses. The victim's hysteria during the telephone call could be overheard by her father who was in the same room as Ms. Wyatt. This is evidence that the victim was still under the stress of the incident and that her statements to Ms. Wyatt directly sprang from the rape while she was still under the stress caused by the incident. Furthermore, the victim's statement that the Defendant said "it wasn't over" qualifies as a

7

statement by a party opponent. As such, the trial court did not abuse its discretion when it allowed Ms. Wyatt to testify about the victim's statements to her. The Defendant is not entitled to relief on this issue.

## B. Ms. Smith's Testimony Regarding the Victim's Father's Statements

The Defendant contends that the State elicited testimony from Ms. Smith about the victim's father's statements, which he claims was inadmissible hearsay. The State responds that the Defendant has waived his issue as it relates to the victim's father's testimony because he fails to identify what testimony was inadmissible. We agree with the State.

The Rules of Appellate Procedure require that citations to authority and references to the record be included in the argument portion of the brief. Tenn. R. App. P. 27(a)(7). The rules of this court also contemplate waiver of issues not supported by citation to authorities or appropriate references to the record. *See* Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). The Defendant's brief contends that the State elicited testimony from Ms. Smith that was objected to and that the trial court warned the State not to "push the envelope" concerning the testimony. However, the brief fails to state which testimony was objectionable and fails to provide any legal argument in support of the Defendant's contention. Therefore, the Defendant has waived review of this issue. *Id.* Nonetheless, we have reviewed the portion of the transcript cited to in the Defendant's brief, and we discern no error in the admission of the testimony.

## C. Ms. Smith's Testimony

The Defendant contends that Ms. Smith's testimony about what the victim told her – that the victim had been raped – was inadmissible hearsay and not subject to any exceptions. The State responds that the Defendant has waived his issue as it relates to Ms. Smith's testimony for failure to support this issue with argument, and even so, it was admissible pursuant to the excited utterance hearsay exception. We agree with the State.

The Defendant risks waiver as to this issue for failure to support his argument with citation to the appropriate authorities. *See* Tenn. R. Ct. Crim. App. 10(b). However, as we have previously stated, the victim's statements to Ms. Smith, which occurred immediately following the rape, and Ms. Smith's testimony in reference to them, were properly admissible at trial pursuant to the excited utterance exception to the hearsay exclusion rule. *See* Tenn. R. Evid. 803(2). For this reason, we conclude that the trial court did not abuse its discretion when it allowed Ms. Smith to testify about what the

victim said to her.   The Defendant is not entitled to relief as to this issue.

## D.  The Victim's Mother's Testimony

The Defendant contends that the victim's mother was impermissibly allowed to testify about the victim's physical condition following the rape.   The State responds that the Defendant has waived his claim with regards to the victim's mother's testimony for failure to adequately brief the issue.   The State further posits that it withdrew its question about the victim's condition, following which the victim's mother was excused from the witness stand without any further testimony, and thus, no error occurred.   We agree with the State.

We again note that the Defendant risks waiver as to this issue for failure to support his argument with citation to the appropriate authorities.  *See* Tenn. R. Ct. Crim. App. 10(b).   However, after review of the transcript, we agree that the victim's mother did not in fact testify about the victim's physical condition because the State withdrew its question and the victim's mother subsequently was excused without further testimony.   Thus, no inadmissible evidence was allowed.   For this reason, the Defendant is not entitled to relief on this issue.

## E.  Ms. Cherry's Testimony

The Defendant next contends that, in response to an improper question asked by the State, Ms. Cherry impermissibly testified about the victim's age and whether it was appropriate for her to be having sexual intercourse at that age.   The Defendant contends that her testimony was a matter of opinion and that it unfairly prejudiced the Defendant.   The State responds that Ms. Cherry only testified that the victim's sexual inexperience caused Ms. Cherry to adjust the questions she asked the victim during the physical exam.   The State posits that Ms. Cherry did not answer the State's question complained of by the Defendant and thus no error occurred.   We agree with the State.

The following exchange occurred at trial:

State: When you asked [the victim] was there penetration of her vagina in question No. 11, and it's check marked successful, 13 is a young age to be having sex with someone, is it not?

[Defense Counsel]: Your Honor, I'm going to object.

State: You brought it up.

9

[Defense Counsel]: I didn't bring up her age.

Trial Court: I'm going to overrule. I'm going to allow you to ask.

State: Okay.

Trial Court: But I would suggest that that's something everyone's going to know.

State: [The victim] said it was the first time she ever had sex, is that correct?

Ms. Cherry: That's what she said.

We agree with the Defendant that the State's question, whether the age of thirteen years old was young to be engaged in sexual activity, attempted to elicit improper opinion testimony from Ms. Cherry. Ms. Cherry testified to her qualifications as a registered nurse and sexual assault nurse examiner but was not admitted as an expert in either field. Tennessee Rule of Evidence 701 states, "If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are rationally based on the perception of the witness and helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Tenn. R. Evid. 701(a)(1)-(2). Our supreme court has noted that "[i]n situations where a [lay] witness 'cannot readily and with equal accuracy and adequacy' testify without an opinion, the witness may state opinions requiring no expertise," including whether a person was intoxicated or whether a car was travelling fast. *State v. Sparks*, 891 S.W.2d 607, 614 (Tenn. 1995) (quoting Tenn. R. Evid. 701, *Advisory Comm'n Cmt.*) However, as is clear from the transcript excerpt, Ms. Cherry never answered the State's question and thus, any abuse in the trial court's discretion in allowing the question was rendered moot. Accordingly, the Defendant is not entitled to relief on this issue.

### F. The State's Questioning of Special Agent Johnson

Finally, the Defendant contends that the trial court abused its discretion when it allowed the State to question Special Agent Johnson about the possibility of a prophylactic being used during the rape when the proof was clear that none was used. The Defendant argues that the State's "hypothetical" question about the use of a prophylactic was misleading and irrelevant. The State responds the trial court properly exercised its discretion when it allowed the State to question Special Agent Johnson about the possibility of a prophylactic. The State contends that the question was proper because it was asked in response to a question asked of Special Agent Johnson on cross-examination about the lack of semen in the vaginal swab.

Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. The State, in response to the Defendant's question on cross-examination eliciting from Special Agent Johnson that no semen was found, asked during redirect-examination whether the use of a prophylactic could have accounted for the lack of semen. The Defendant objected on the grounds that there was no evidence that a prophylactic had been used. The trial court allowed the witness to answer, and Mr. Johnson replied that the use of a prophylactic could account for no semen being found. On recross-examination, the Defendant asked Mr. Johnson whether he had any indication that a prophylactic had in fact been used during the rape, at which time the State "submitted" that one had not been used.

In our view, by asking this hypothetical question about the prophylactic, the State may have "allude[d] to [a] matter that [was] not [] supported by the evidence," Sup. Ct. Rules, Rule 8, RPC 3.4, as there was no evidence at that point in the trial that a prophylactic had been used by the Defendant. The State's "submission" that a prophylactic had not been used by the Defendant, coming shortly after the "hypothetical" question involving the use of a prophylactic, causes this court concern. As the trial progressed, had the Defendant presented evidence of a prophylactic being used, the State could have recalled Special Agent Johnson to testify that the absence of semen could have been accounted for by the use of a prophylactic. The fact that no semen was found was a crucial piece of evidence, as indicated by the jury's verdict of *attempted* rape, which leads us to conclude that this possible violation of Supreme Court Rule 8 by the State's attorney, and the error by the trial court in allowing an improper hypothetical question, were both harmless errors. The Defendant is not entitled to relief on this issue.

### III. Conclusion

After a thorough review of the record and the applicable law, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE

11