IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 23, 2002 Session

**STATE OF TENNESSEE v. CLAUDE W. CHEEKS**

**Direct Appeal from the Criminal Court for Hamilton County**
**Nos. 222245, 222283, and 223379     Rebecca J. Stern, Judge**

---

**No. E2001-00198-CCA-R3-CD**
**July 22, 2002**

---

The appellant, Claude W. Cheeks, was convicted by a jury in the Hamilton County Criminal Court of one count of especially aggravated robbery and two counts of aggravated assault. The trial court sentenced the appellant to a total effective sentence of twenty-five years incarceration in the Tennessee Department of Correction. On appeal, the appellant specifically raises the following issues: (1) "whether the trial court erred in allowing the jury to consider the evidence where the State's doctors all supported the insanity defense and there was no sufficient lay testimony, nor other testimony that contradicted the insanity defense," and (2) "whether it is permissible for the State to seek the assistance of expert witnesses in the field of psychiatry, then to provide the experts the information on which to base their opinion, and then at trial to reject the State's experts and attack their results and offer no proof." Upon review of the record and the parties' briefs, we reverse the judgments of the trial court on all three counts, institute verdicts of not guilty by reason of insanity on each count, and remand for proceedings pursuant to Tenn. Code Ann. § 33-7-303 (2001).

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Reversed,
Modified, and Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which GARY R. WADE, P.J., joined. JOSEPH M. TIPTON, J., filed a dissenting opinion.

Bryan Henry Hoss, C. Leland Davis, and David W. Wallace, Chattanooga, Tennessee, for the appellant, Claude W. Cheeks.

Paul G. Summers, Attorney General and Reporter; Angele M. Gregory, Assistant Attorney General; William H. Cox, District Attorney General; and Dean Ferraro and Mary Sullivan Moore, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

On the morning of June 24, 1998, at approximately 10:30 a.m. or 11:00 a.m., the victim, Frederick Stuart Newman, and his son, Christopher, walked from Newman's restaurant to AmSouth Bank in downtown Chattanooga to get change for the restaurant. At trial, Newman testified that he and eight-year-old Christopher walked into the bank, talked with some people they knew, and then requested the change from the teller. He placed the change in a blue AmSouth deposit bag and picked up the bags from the previous day's deposit. Newman noted that, after collecting money from the bank, his normal procedure was to walk into the outer lobby of the bank, look around for anything that might be of concern, and light a cigarette before leaving the building.

As Newman and Christopher walked into the outer lobby of the bank, the appellant approached and asked Newman for a cigarette. Newman replied that he was sorry, but the cigarette in his hand was his last. Newman recalled at trial that the appellant did not appear angry or agitated by his response, and Newman and Christopher continued to walk out of the building. Newman further testified that he has no memory of leaving the bank, but he does remember falling onto the pavement outside the bank, explaining that "I was you know, thinking, you know, 'What a dummy, you just tripped over your shoelaces.'" He recounted that he had "tunnel vision" and then felt himself hit the pavement. He heard Christopher scream but was unable to get up. Newman related that he next remembers being dragged into the bank where he drifted in and out of consciousness while his wife, a nurse who was called to the scene, worked to stabilize him until an ambulance arrived.

When Newman regained consciousness, neither he nor his son had possession of the deposit bag. He explained that he received lacerations to the back of his skull, which injuries required thirty to forty stitches, and his skull was fractured. He also had "a brain hemorrhage," as well as additional fractures. Newman stated that he continues to have pain, mobility problems, and memory problems. Specifically, he estimated that he has "about 70 percent of my abilities back, and that [is] probably about as far as I [can] go."

Christopher Newman testified that he was with his dad on the day of the offenses. He saw the appellant as they walked out of the bank. As they left, he saw his dad fall to the ground, and the appellant started beating his dad on the head with a cinder block. Christopher screamed and ran into the bank for help. When he ran back to his dad, he saw a man named Ron Hines stop his car and attempt to assist Newman. The appellant then attacked Hines. Christopher noted that the appellant took the bag of change from his dad.

Teresa Bailey, an employee of AmSouth Bank, was working at the bank's downtown branch on June 24, 1998. She testified that, on the morning of the offenses, she observed the appellant come into the bank on two separate occasions and was informed that he withdrew two dollars ($2) from his account on each visit. Bailey recounted that she had known the appellant "years ago" when she worked at the Freight Depot office where the appellant had an account. She recalled that the appellant frequently came into the Freight Depot office to cash checks or make deposits. She did not know if the appellant was a frequent customer at the downtown AmSouth Bank because she had "just been back to that bank." Although she did not assist the appellant on the morning of the

offenses, she did observe him walk across the lobby of the bank during both visits. Bailey concluded that the appellant appeared to act normally and seemed to be in control of his physical and mental facilities. She contended that two withdrawals of two dollars ($2) each within a two-hour period was not abnormal banking procedure. Bailey conceded that she was in a separate room and did not witness the assault on Newman.

Kimberly Needham Day testified that, on the day of the offenses, she was walking out of a building next to AmSouth Bank in downtown Chattanooga when she saw the appellant walk behind Newman and Christopher, raise a cinder block, and hit Newman on the head two or three times. She asserted that the appellant quickly walked away holding a blue deposit bag. The area was busy because of the lunchtime crowd, and the appellant was followed by several people who attempted to detain him. She did not see the arrest and was unable to say whether the appellant resisted arrest. Day acknowledged that she observed the appellant for only ten or fifteen seconds from a distance of forty feet. However, she positively identified the appellant as the perpetrator.

Ronald Hines testified that, on June 24, 1998, he was driving through downtown Chattanooga when he saw the appellant standing over Newman, beating Newman on the back of the head. Hines jumped from his vehicle and ran toward the appellant, ordering the appellant to stop. The appellant stopped, looked up at Hines with his hand raised, snatched the deposit bag, and ran down the street. Hines continued shouting, demanding that the appellant stop. The appellant stopped in a crowd of people, turned to Hines, and said, "Oh, you want some of this?" The appellant then lunged at Hines and struck him in the head with the cinder block. The two men "tussled," and Hines forced the appellant against a tree. The appellant hit Hines in the shoulder with the cinder block, and Hines struck the appellant in the groin. When the appellant dropped to his knees, Hines ran to the nearby Justice Building to obtain assistance. The appellant was eventually apprehended by police. As a result of the altercation, Hines sustained a bruise on his shoulder and received eleven stitches in his head.

Officer James T. Chapin of the Chattanooga Police Department testified that he was having lunch at a restaurant in the area when he received a report of a robbery in progress. As he stepped outside the restaurant, he looked across the street and saw the appellant walking on the sidewalk. The appellant was being followed by a crowd of people who were pointing at him and also by a truck whose driver was honking the horn. The appellant was not running or fleeing but appeared to be "just walking." Officer Chapin approached the appellant and told him to stop. The appellant complied, offering no resistance. Officer Chapin then placed the appellant under arrest. Officer Chapin testified that, at the time of the arrest, he was in uniform and visibly armed. A deposit bag was in the appellant's hand, and a piece of cinder block was found in the appellant's jacket pocket.

Following the appellant's arrest, Officer Chapin transported him to the police station. The appellant remained mostly uncommunicative and sat on a bench with a "blank look on his face." When Officer Chapin asked the appellant why he had committed the crime, the appellant replied, "I was hungry," asked "When is lunch?" and began laughing. Officer Chapin conceded that,

-3-

immediately upon encountering the appellant, it was apparent that "there was something wrong with this guy." The appellant's eyes were vacant and emotionless, he had been followed by a vocal crowd without seeming to notice, and he laughed and smiled inappropriately during the booking procedure.

Dr. David Ciraulo, a trauma critical care surgeon at Erlanger Medical Center, treated Newman following the assault. He reported that Newman was hospitalized for three to four days following his injuries. As a result of the injuries, including a closed head injury, Newman suffered extreme pain and extensive blood loss. At the time of discharge, Newman had problems maintaining his gait and was sent home with a walker. Newman also complained of headaches and memory problems. Dr. Ciraulo opined that such an injury poses a substantial risk of death.

After presenting the foregoing proof, the State rested. The defense moved for judgments of acquittal, which motions were denied. Thereafter, the defense presented the testimony of two mental health professionals, Dr. Bob Brown and Dr. Madhusudham Mudiam.

Dr. Brown testified that he is a psychologist and is employed by the State of Tennessee at Moccasin Bend Mental Health Institute (MBMHI). In 1998, in response to a request by the trial court, an evaluation team at MBMHI performed a forensic evaluation of the appellant for the court. Dr. Brown, a member of the team, explained that, when the court requests a forensic evaluation, typically the questions to be answered are: whether the individual is competent to stand trial, whether the individual can defend himself against the charges in a court of law, and whether there is support for the insanity defense. Accordingly, the evaluator must determine the mental state of the individual at the time of the crime as well as at the time of trial. Dr. Brown stated that, of all cases referred by the courts in a given year, only four percent (4%) to six percent (6%) can support an insanity defense. Dr. Brown stated that a finding of incompetency to stand trial is also rare.

In October 1998, following the forensic evaluation at MBMHI, the evaluation team deemed the appellant incompetent to stand trial due to his confusion and paranoia. Dr. Brown explained that the appellant was unable to understand the charges against him, was unable to cooperate with his attorney, did not understand a court proceeding, and "could not even manage his behavior appropriately in a courtroom setting." Notably, during a meeting with the evaluation team, the appellant claimed that "Dr. Nickerson is the judicial judge." Dr. Brown concluded that the appellant was in need of "extensive, intensive, inpatient psychiatric services."

Dr. Brown further related that the appellant has a history of treatment for mental illness, which history began in April 1980 when the appellant was admitted to MBMHI and was diagnosed with paranoid schizophrenia, a diagnosis that was reiterated in later years. Dr. Brown explained that schizophrenia is, "in the opinion of most mental health clinicians, probably the most severe form of mental illness." Specifically addressing the appellant's mental condition in 1998, Dr. Brown noted that

> [he] had the disorganized behavior, which is one of the prominent features [of paranoid schizophrenia]. He could not adequately monitor his behavior, behave himself adequately the first time we

wanted to meet with him and the second time, we had to terminate
because he was so agitated, and we felt that the [evaluation] team was
at risk of being harmed by his behavior.

Dr. Brown observed, however, that someone suffering from paranoid schizophrenia could also appear superficially normal.

Dr. Brown additionally recalled that, during an interview on November 3, 1998, the appellant told the evaluation team that he attacked Newman because he was chosen by the Lord to intervene in Newman's life. Additionally, the appellant stated that "Satan saved my life. I read the Bible through twice, took three years. God asked me to rule the world." Dr. Brown reported that the appellant then began to stare at the members of the team and laugh inappropriately. It was on this occasion that the interview was terminated due to concern that the team was at "risk of harm" from the appellant. Dr. Brown reported that, following this interview, the appellant responded well to antipsychotic medication, and, on November 12, 1998, he was discharged. At that time, the appellant was deemed competent to stand trial. However, Dr. Brown asserted that the forensic team unanimously concluded that an insanity defense could be supported. Following his discharge, the appellant was returned to jail, and his treatment was monitored through the Sheriff's Department by Johnson Mental Health Center.

In early 2000, the trial court ordered a reevaluation of the appellant. The appellant was readmitted to MBMHI on February 16, 2000, and an evaluation team was again assembled to assess the appellant.[1] The team once again concluded that the appellant was competent to stand trial but noted that

[i]t has been determined that a defense of insanity on the charges of
aggravated assault and aggravated robbery can be supported on the
basis of a severe mental illness as a result of a psychotic spectrum
disorder, in [the appellant's] case, schizoaffective disorder.

Specifically, Dr. Brown explained that "[t]he conclusion in '98 and in 2000 are the same. And in probably the most basic terms, the [appellant] could not appreciate the rightfulness or the wrongfulness of his conduct" because "[all] the data that we have available indicates that he was suffering from the acute phase of schizophrenia at the time of the alleged offenses."

On cross-examination, Dr. Brown conceded that there were some inconsistencies in the appellant's version of events. Dr. Brown also acknowledged that, on the day of the offenses, the appellant was in sufficient control of his behavior to go into the bank where he had an account, withdraw funds from his account, and, after the offenses, submit to an armed, uniformed police officer. Finally, Dr. Brown admitted that, during the 2000 evaluation, two tests showed that the appellant was malingering to gain support for his insanity defense and to show his innocence of the crimes charged. Nevertheless, Dr. Brown maintained that the malingering was taken into account

---

[1] The "attending members of the forensic team" for the 2000 evaluation were Dr. Bob Brown, Wilbert Bunch, Dr. Madhusudham Mudiam, Dr. John Lowe, Dr. Willis Marshall, John Hartman, Ed Rocca, Donald Bailey, Ursula Bell, and Patricia Alverson.

by the team in their evaluation, and Dr. Brown unwaveringly asserted that an insanity defense could be supported.

The second witness to testify for the defense was Dr. Mudiam, a psychiatrist who worked at MBMHI and was a member of the forensic team that evaluated the appellant in 2000. At the time of Dr. Mudiam's evaluation, the appellant was receiving antipsychotic medication. Dr. Mudiam testified that the appellant was diagnosed with

> Schizoaffective Disorder and what that means is a person sometimes in the course of the mental illness, in addition to the symptoms that are primarily associated with schizophrenia, which are like hearing the voices that are not there or feeling like people are out to get them. The patients also suffer from associated symptoms of what we call as either mania or depression.

According to Dr. Mudiam, the appellant exhibited the features of mania, namely elation and excess energy. He opined that the appellant was "suffering from severe mental illness at the time of the alleged events," and, based upon the information he obtained, the appellant "was not able to appreciate the nature of the wrongfulness of the alleged act."

Dr. Mudiam noted that, in addition to the facts regarding the appellant's account of his offenses, the forensic team also strongly considered the statements of the arresting officer. Specifically, the psychological report noted Officer Chapin's comments that he recognized that the appellant was suffering from a mental illness and that he knew "right away that this was going to be one of those cases." The report also noted that, prior to the offenses, the appellant had two previous admissions to MBMHI. The admissions followed two incidents in which the appellant was apparently "acting bizarre on the streets" and was picked up by police after threatening to kill people. The appellant also reported hearing voices that only he could hear. Although Dr. Mudiam conceded that the appellant gave conflicting reports in 1998 and 2000 as to whether he heard voices at the time of the offenses, Dr. Mudiam reiterated his belief that an insanity defense could be supported.

On cross-examination, Dr. Mudiam admitted that he did not meet the appellant until the 2000 evaluation, almost two years after the offenses. He agreed that assessing an individual's mental state so long after the offenses is more difficult. He also noted that he received most of the information regarding the offenses from the District Attorney General's Office. Additionally, in response to the State's question concerning whether the appellant knew the difference between right and wrong, Dr. Mudiam testified that "[a]t the time he was seen in the forensic team [in 2000] he knew but not on the day of the alleged crime." Dr. Mudiam explained that, at the time of trial, the appellant knew right from wrong and could control his behavior because, unlike the day of the offenses, the appellant was taking his medication and receiving mental health treatment.

After considering the foregoing evidence, the jury found the appellant guilty of the aggravated assault of Hines, the aggravated assault of Newman, and the especially aggravated robbery of Newman. The trial court sentenced the appellant as a Range I offender to three years incarceration for the aggravated assault of Hines, four years for the aggravated assault of Newman,

and twenty-one years for the especially aggravated robbery of Newman. The trial court ordered that the sentences for aggravated assault be served concurrently with each other but consecutively to the especially aggravated robbery sentence for a total effective sentence of twenty-five years incarceration. On appeal, the appellant alleges that the trial court erred by denying his motions for judgments of acquittal because there was no evidence to contradict the insanity defense and because he contends that "it is [im]permissible for the State to seek the assistance of expert witnesses in the field of psychiatry, then to provide the experts the information on which to base their opinion, and then at trial to reject the State's experts and attack their results and offer no proof." [2]

## II. Analysis

Although the appellant outlines his argument as two separate issues, the heart of the appellant's challenge is whether the trial court erred in failing to grant his motions for judgments of acquittal at the conclusion of all of the proof.[3] The standard employed by the trial court in ruling upon a motion for judgment of acquittal is essentially the same standard utilized by this court on appeal when examining a challenge to the sufficiency of the evidence. State v. Carroll, 36 S.W.3d 854, 869 (Tenn. Crim. App. 1999). Accordingly, before granting a judgment of acquittal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Price, 46 S.W.3d 785, 818 (Tenn. Crim. App. 2000), perm. to appeal denied, (Tenn. 2001). Additionally, we note that "[t]he weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the triers of fact." State v. Manning, 909 S.W.2d 11, 13 (Tenn. Crim. App. 1995). The appellant bears the burden of establishing that no reasonable trier of fact could have found the essential elements of the offenses in question beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Price, 46 S.W.3d at 818; Tenn. R. App. P. 13(e).

The appellant was indicted for the aggravated assault of Hines, the aggravated assault of Newman, and the especially aggravated robbery of Newman. Based upon our review of the record, we conclude that the evidence clearly demonstrates that the appellant committed the alleged crimes. See Tenn. Code Ann. § 39-13-102(a)(1) and -403(a) (1997). Moreover, at trial and on appeal, the appellant concedes that he committed each of the charged offenses. However, the appellant contends that he established the defense of insanity by clear and convincing evidence, and, therefore, he should have been found not guilty by reason of insanity.

---

[2] Although the appellant's brief states his issues in these terms, his argument focuses on the trial court's denial of his motion for judgments of acquittal.

[3] We note that, because the State no longer bears the burden of establishing the appellant's sanity as an element of the offenses, see State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999), and the appellant conceded that he committed the offenses, the appropriate time for the motions for judgments of acquittal was at the conclusion of the defense proof. In the instant case, the appellant moved for judgments of acquittal at the conclusion of the State's proof and at the conclusion of the defense proof.

The insanity defense became an affirmative defense on July 1, 1995.[4]  The statute codifying the defense, Tenn. Code Ann. § 39-11-501(a) (1997), provides:

> It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of such defendant's acts.  Mental disease or defect does not otherwise constitute a defense.  The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

Evidence is clear and convincing when "there is no serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence."  State v. Holder, 15 S.W.3d 905, 912 (Tenn. Crim. App. 1999).  Such a burden is higher than "preponderance of the evidence," and lesser than "beyond a reasonable doubt."  O'Daniel v. Messier, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995).  Moreover, this court recently explained that,

> [i]n determining the issue of insanity, the trier of fact may consider both lay and expert testimony and may discount expert testimony which it finds to be in conflict with the facts of the case.  Where there is a conflict between expert testimony and testimony as to the facts, the trier of fact is not required to accept expert testimony over other testimony and must determine the weight and credibility of each in light of all the facts and circumstances of the case.  In determining the defendant's mental status at the time of the alleged crime, the trier of fact may look to the evidence of his actions and words before, at, and immediately after the commission of the offense.

Holder, 15 S.W.3d at 912 (citations omitted).  We further note that, given the nature of the question to be answered by the jury, cases involving the insanity defense are particularly fact-specific.

In the instant case, the lay witnesses who testified on behalf of the State had extremely limited contact with the appellant at the time of the offenses and had little or no contact with him prior to the offenses.  Specifically, Bailey had known the appellant "years ago" but had no recent contact with the appellant other than to observe him from a distance as he walked across the lobby of the bank on the morning of the offenses.[5]  Day had never seen the appellant prior to the day

---

[4]  Prior to July 1, 1995, the defendant bore the initial burden of proof regarding his or her insanity.  State v. Sparks, 891 S.W.2d 607, 615 (Tenn. 1995); see also Tenn. Code Ann. § 39-11-501 (1991); Graham v. State, 547 S.W.2d 531, 544 (Tenn. 1977).  Then, if the proof raised a reasonable doubt as to the defendant's sanity, the burden shifted to the State to prove the defendant's sanity as an element of the offense.  Sparks, 891 S.W.2d at 615-616; see also Wilcoxson v. State, 22 S.W.3d 289, 314-15 (Tenn. Crim. App. 1999).

[5]  We note that, prior to the change in the insanity defense in 1995, this court stated that "lay testimony of a defendant's normal behavior, in and of itself, is insufficient to rebut the testimony of expert witnesses when the mental illness or defect involved is of such a nature that the appellant would behave normally and would not exhibit any signs of mental illness unless specifically questioned as to that defect."  State v. Laura Ann Hudson, No. 01C01-9608-CC-
(continued...)

of the offenses and only observed him for ten or fifteen seconds from a distance of approximately forty feet. Notably absent is the testimony of any witness who had any relationship with, contact with, or extended knowledge of the appellant. See State v. Christopher M. Flake, No. W2000-01131-CCA-MR3-CD, 2001 Tenn. Crim. App. LEXIS 517, at *15 (Jackson, July 13, 2001), perm. to appeal granted, (Tenn. 2001); cf. State v. Sparks, 891 S.W.2d 607, 617 (Tenn. 1995); State v. James Morrow, No. 02C01-9810-CR-00333, 1999 Tenn. Crim. App. LEXIS 1326, at **8-9 (Jackson, December 29, 1999). Other than Officer Chapin and a brief comment to Hines ("Do you want a piece of this?"), no witness even had a conversation with the appellant. Moreover, the State's witness Officer Chapin clearly recognized that the appellant was suffering from a mental health problem. In sum, the sparse lay testimony offered by the State is simply inadequate to refute the testimony of the expert witnesses that the appellant could not appreciate the wrongfulness of his conduct. See Flake, No. W2000-01131-CCA-MR3-CD, 2001 Tenn. Crim. App. LEXIS 517, at *13; cf. State v. Brian Val Kelley, No. M2001-00461-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 424, at **61-69 (Nashville, May 7, 2002).

Significantly, the mental health experts who testified at trial evaluated the appellant at the request of the trial court. Moreover, these experts testified that they routinely perform evaluations on behalf of the State. The experts initially found the appellant incompetent to stand trial; yet, through treatment and medication, his condition improved, and he was eventually deemed competent to stand trial. However, for more than two years after the offenses, the experts consistently and unanimously concluded that an insanity defense could be supported in the appellant's case. Specifically, as we earlier noted, both mental health experts, after extensively evaluating the appellant, vehemently testified that the appellant was suffering from a severe mental illness at the time of the offenses and could not appreciate the wrongfulness of his acts. See Flake, No. W2000-01131-CCA-MR3-CD, 2001 Tenn. Crim. App. LEXIS 517, at *14; cf. Kelley, No. M2001-00461-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 424, at *63; State v. Charles Edward Overby, No. E1999-00253-CCA-R3-CD, 2000 Tenn. Crim. App. LEXIS 179, at *19 (Knoxville, March 6, 2000), perm. to appeal denied, (Tenn. 2000) (recommended for publication). While we acknowledge that the State thoroughly cross-examined the appellant's experts, the appellant's witnesses did not waiver in their assessment that the appellant could not appreciate the wrongfulness of his conduct at the time of the offenses. Accordingly, "[t]he testimony of state witnesses . . . did not create an issue for the jury." Flake, No. W2000-01131-CCA-MR3-CD, 2001 Tenn. Crim. App. LEXIS 517, at *14. Notably, the expert testimony was not "in conflict with the facts of the case." Sparks, 891 S.W.2d at 616. We recognize that, generally, if there is any evidence to support the jury's rejection of the insanity defense, this court must defer to the findings of the triers of fact. State v. Perry, 13 S.W.3d 724, 734 (Tenn. Crim. App. 1999). However, "our review of the record does not reveal sufficient lay testimony, nor expert testimony, concerning the defendant's mental state at or near the time of the [offenses] that would justify rejection of the insanity defense." Flake, No. W2000-01131-CCA-MR3-CD, 2001 Tenn. Crim. App. LEXIS 517, at *16. Therefore,

---

[5](...continued)
00270, 1999 Tenn. Crim. App. LEXIS 144, at **21-22 (Nashville, February 19, 1999).

> [a]fter a [thorough] review of the evidence, we reach the following
> inescapable conclusion: a rational trier of fact could only find that
> there is no serious or substantial doubt that the defendant, at the time
> of the [offenses], was unable to appreciate the wrongfulness of his
> act[s] as a result of a severe mental disease.

Id. at *15.

We emphasize in closing that there are two recent cases authored by this court regarding the insanity defense. In the most recent case, Kelley, No. M2001-00461-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 424, at *61, this court explained that

> [t]he insanity defense has two prongs, both of which must be
> satisfied: (1) a severe mental disease or defect must exist at the time
> of the crime, and (2) the disease or defect must have resulted in the
> defendant's inability to appreciate the nature or wrongfulness of his
> criminal actions.

Upon review of the record in Kelley, we concluded that, "[w]ith regard to the first prong, whether Defendant suffered from a severe mental disease or defect, the proof overwhelmingly supports Defendant's position." Id. However, because the experts were "less decisive" on the issue of whether Kelley appreciated the wrongfulness of his actions and because there was proof in the record that Kelley had repeatedly recognized that his actions were wrong, Kelley failed to establish the second prong of the insanity defense by clear and convincing evidence.[6] Id. at **62-63; see also Holder, 15 S.W.3d at 909-10.

In the second case, Flake, No. W2000-01131-CCA-MR3-CD, 2001 Tenn. Crim. App. LEXIS 517, at **13-14 (footnote and citation omitted),

> [b]oth evaluating psychiatrists and all evaluating clinical
> psychologists testified that the defendant, at the time of the offense,
> suffered from a severe mental disease and was unable to appreciate
> the wrongfulness of his act. The medical testimony consistently
> supported the statutory elements of the insanity defense. Even the
> two non-evaluating physicians called by the state in rebuttal agreed
> that the defendant suffered from a severe mental disease.

Accordingly, this court found that Flake had established the insanity defense by clear and convincing evidence, requiring the judgment against Flake to be modified to "Not Guilty By Reason of Insanity." Id. at *17. Of the two cases, we conclude that the facts of the instant case are distinguishable from those in Kelley and are more closely aligned with those in Flake. Accordingly, after viewing the evidence in the light most favorable to the State, we can only conclude that the

---

[6] Kelley often acknowledged that "'What I did according to the laws of this country, yes, sir, it was wrong. But I don't go by the laws of this land, I go by the laws of God.'" Kelley, No. M2001-00461-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 424, at **62-63.

appellant established by clear and convincing evidence that he was insane at the time of the offenses.

### III.  Conclusion

Based upon the foregoing, we reverse the judgments of the trial court, modify the judgments to reflect that the appellant is found "not guilty by reason of insanity" on all three counts, and remand for further proceedings.  See Tenn. Code Ann. § 33-7-303 (2001).

_____
NORMA McGEE OGLE, JUDGE