IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 24, 2004

# STATE OF TENNESSEE v. RICHARD LAFAYETTE SUMNER

**Appeal from the Circuit Court for Cocke County**
**No. 8285      Ben W. Hooper, II, Judge**

_____

**No. E2003-00570-CCA-R3-CD**
_____April 30, 2004_____

The defendant, Richard Lafayette Sumner, appeals as of right from his convictions by a jury in the Cocke County Circuit Court for two counts of first degree premeditated murder, one count of first degree felony murder, and one count of aggravated arson. The defendant was sentenced to life imprisonment with the possibility of parole for each murder and twenty-five years for the aggravated arson, to be served concurrently in the Department of Correction. He contends that the evidence is insufficient to support the jury's rejection of his insanity defense. We hold that the evidence is sufficient to convict the defendant of first degree murder. We also hold, though, that the convictions for the premeditated and felony murders in counts one and three should be merged pursuant to the Double Jeopardy Clause. We affirm the convictions, but vacate the judgments as to counts one and three and remand the case for the trial court to enter a judgment reflecting a merger of those two counts.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part;**
**Vacated in Part; Case Remanded**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Edward C. Miller, District Public Defender, for the appellant, Richard Lafayette Sumner.

Paul G. Summers, Attorney General and Reporter; Thomas E. Williams, III, Assistant Attorney General; Al C. Schmutzer, Jr., District Attorney General; James Bruce Dunn and Joanne Ellis, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case relates to the defendant's killing his mother and father, Richard and June Sumner, on September 7, 2000. Sue Massey, the victims' and the defendant's neighbor, testified that in the early hours of September 7, 2000, she smelled smoke but did not see a fire when she looked out of her window toward the victims' trailer. She said that around 6:00 a.m., her son returned home,

blowing his car's horn. She said he told her the victims' trailer was on fire and to call 9-1-1. On cross-examination, Ms. Massey testified that she was aware the defendant had mental problems. She said the defendant's mother was worried about him but never mentioned the defendant becoming violent.

Willard Taylor, Chief of the Cocke County Fire Department, testified that when he arrived at the victims' trailer on September 7, 2000, it was engulfed in flames. He said that after the fire department extinguished the fire, they went through the remains of the trailer and found two bodies. He said that he later found the defendant about one-half mile from the trailer and that he was standing next to a car with a shotgun on top of the car. He said he left without talking to the defendant and told the police where they could find him. On cross-examination, Chief Taylor testified that the defendant did not hide or run from him.

April Mullins, the defendant's sister, testified that her mother was sixty-one years old and that her father was fifty-eight years old when they were killed. She said that her mother owned a Chevrolet Celebrity and that she let the defendant drive the car whenever he wanted. She said the defendant lived with their parents, was never married, but had two kids. She said the defendant had never had a regular job but cooked and mowed the yard for their parents sometimes. She said she knew the defendant was mentally ill but allowed him to babysit her three children on a regular basis. She said the defendant gave her a letter in which he admitted killing their parents and apologized for it. She said that in the letter, the defendant said that he was out of his mind when he killed their parents, that aliens told him to do it, and that their mother had begged for her life before he killed her. She said the letter stated that he set the fire to kill their father and that he held the door shut to keep their father from escaping.

On cross-examination, Ms. Mullins testified that when the defendant was taking his medication, he was kind but that he could become violent when he did not take it. She said she did not take her children to her parents' trailer for the defendant to babysit after he quit taking his medication in the fall of 2000. She said, however, that she did not believe the defendant was dangerous; she just did not want to add to the stress at the trailer. She acknowledged that their mother told her that on one occasion, the defendant had returned to the trailer naked, stating that aliens were after him. She acknowledged that on another occasion, the defendant drove to the Knoxville airport to meet these aliens. She said he had also called the police twice to report UFO sightings. She said that the defendant had been involuntarily committed twice but that their mother could not bring herself to commit him again. She acknowledged the defendant believed in astrology and had asked for her to bring him one of his astrology books in jail. She said the defendant believed his penis was deformed and wanted to find the doctor who had circumcised him. She acknowledged that in the letter from the defendant, he said that aliens told him that if he killed his mother and father, he would get his own place to live and a girlfriend. She acknowledged that the defendant's behavior became progressively worse throughout the summer before he killed their parents. She said the defendant told her that Dr. Alan Megibow had advised him that he could stop taking his medication. She said that the defendant was sick and that she wanted him to be in a hospital rather than jail.

2

Gary Claybough, an arson investigator from the Tennessee Fire Marshal's Office, testified that he arrived at the victims' trailer at 9:00 a.m. and saw the two victims' bodies. He said that one body was in the kitchen and that the other was in a bedroom. He said that he determined that an accelerant had been used to start the fire and that he found a five-gallon can he believed contained gasoline. He said the fire was intentional and deliberate.

Dr. Cleland Blake, a pathologist, testified that he received the victims' bodies and performed an autopsy on each body. He said the defendant's mother did not die from the fire because she did not have carbon monoxide in her lungs. He said his findings with regard to the defendant's mother were consistent with strangulation. He said that the defendant's father died from the fire.

Detective Derrick Woods of the Cocke County Sheriff's Department testified that he investigated the area where the defendant was found by Chief Taylor and collected a T-shirt, a pair of pants, a fire safety book, camping gear, two lighters, a five-gallon gas can, and a shotgun. He said he sent the fire chief to look for the defendant because he had not been found after the fire. On cross-examination, Detective Woods testified that when he apprehended the defendant, the defendant did not attempt to escape.

Robert Caldwell, chief detective for the Cocke County Sheriff's Department, testified that he met with the defendant at the scene of the fire and that the defendant agreed to talk at the police station. He said the defendant told him where he poured gasoline into the trailer and identified the gas can he used. He said the defendant told him that he changed clothes after the fire and that blood on his right sock was his mother's. He said the defendant stated that his father was asleep when he killed his mother.

Earl Campbell, the defendant's and his mother's preacher, testified that he was aware of the defendant's mental problems. He said the defendant was quiet when he was on his medication but vocal when he was off. He said that the defendant told him that his penis was deformed because of a circumcision and that the defendant showed him his penis. He said that the defendant had bizarre religious beliefs involving astrology and that he told the defendant to throw away the material he had regarding it. He said the defendant's mother called him several days before the defendant killed her and told him that she was concerned because the defendant was off his medication. On cross-examination, Mr. Campbell testified that in a conversation with the defendant three weeks before he killed his parents, the defendant told him that his mother owned property in Dandridge, Tennessee and that it would be advantageous if "she was not in the way of progress." He said he believed that a possibility of a serious occurrence existed because of this conversation and encouraged the defendant to drop the matter. On recross-examination, Mr. Campbell testified that the defendant told him that he wanted his mother's name off the deed of trust for the Dandridge property.

Dr. Alan Megibow testified that he was a psychiatrist at the Cherokee Mental Health Center and that he began treating the defendant in 1995. He said the defendant was diagnosed as a chronic paranoid schizophrenic and was prescribed potent medication to control his delusions. He said that the defendant believed aliens were trying to take over the world and that they were trying to control

him. He said the defendant did not take his medication on several occasions while he was treating him. He said that in a 1995 report, he wrote that the defendant was potentially violent and that in a 1998 report, he wrote that he returned the defendant to medication because he had become violent. He said that on June 22, 2000, he determined that the defendant had stopped taking his medication. He said the defendant had told a nurse that aliens created humans on this planet. Dr. Megibow said the defendant told him not to talk about his case with his mother. He said that unless he involuntarily committed the defendant because he was a danger to himself or others, he could not force the defendant to take medication. He said the defendant had made no direct threats toward anyone at that time. He said that in his visits with the defendant at jail, the defendant seemed okay at times while at others, he obsessed about aliens.

On cross-examination, Dr. Megibow testified that in a progress note dated March 13, 2002, he wrote that the defendant told him that aliens would give him a girlfriend and a place of his own if he killed his parents and that this is why he decided to kill his parents. He said the defendant wrote in a separate note that aliens told him to slap his father but that he hugged his father instead. He said the note also stated that the aliens had wanted him to lie in the yard during a storm but that the defendant did not because he was too scared. Dr. Megibow acknowledged that many people with schizophrenia do not kill other people. He said he believed that the defendant knew the difference between right and wrong when he killed his parents. On redirect examination, Dr. Megibow said that it was possible that the defendant killed his parents in order to get a girlfriend and did not consider the wrongfulness of his actions.

Christie Hansel testified that she was one of the defendant's case managers at Cherokee Mental Health Systems. She said Cherokee's reports indicated the defendant had attacked his brother-in-law with a hammer and had also attacked his father in the past. She said the defendant had also been violent toward his mother at times. She said the defendant believed that a foreign material was inserted into his penis during his circumcision and that he wanted to confront the doctor who performed the circumcision on him. She said the defendant told her in jail that voices told him that his parents were cold and cruel before he killed them. She said that in the weeks before the fire, the defendant refused to help his parents with work around the house. She said even though the defendant was forced to take medication in jail, he still had delusions. On cross-examination, Ms. Hansel testified that her notes indicated that the defendant was concerned about not having a girlfriend.

Dr. Rokeya Farooque, a psychiatrist at Middle Tennessee Mental Health Institute (MTMHI), testified that the defendant was a paranoid schizophrenic and that she did not believe he understood the difference between right and wrong when he killed his parents. She said that in a test she performed on the defendant, his score indicated he was mentally ill, having hallucinations and delusions upon which he acted. She said that the defendant's not hiding or attempting to escape after the killing indicated that the defendant did not know killing his parents was wrong. On cross-examination, she acknowledged that the defendant had cried over killing his parents.

4

Dr. Samuel Craddock, a psychologist at MTMHI, testified that not all schizophrenics lack the capacity to understand the difference between right and wrong. He said he believed that the defendant had known that killing his parents was both criminally and morally wrong. On cross-examination, Dr. Craddock testified that he believed the defendant had delusions about aliens. He said, however, that just because the defendant heard voices promising him a girlfriend if he killed his parents did not mean that the defendant did not understand that killing his parents was wrong. He said he did not know for a certainty that the defendant understood the difference between right and wrong. He said, however, that setting fire to his parents' trailer to cover up his killing indicated that he knew right from wrong. He acknowledged that he had previously determined that the defendant was not competent to stand trial and that he was committable. He said, however, that after the defendant resumed taking his medication, he determined that the defendant was competent to stand trial.

Officer Duane Johnson of the Cocke County Sheriff's Department testified that on September 7, 2000, the defendant gave the following statement: On the night he killed his parents, his mother was aggravated at his father over the television and told his father to go to bed. His father went to bed "disgusted and hurt." His mother then went into the bathroom and when she came out, he shoved her into his bedroom and wrestled her to the floor. He held a blanket over her mouth, suffocating her. He put newspaper in a trash can and started a fire because he had panicked and wanted to cover up what he had done. His father never heard what happened and never woke up. He went to the barn, retrieved a gasoline can, and poured gasoline through the window of the trailer because the trailer was not burning well enough. The fire then blazed, and he returned the gasoline can to the barn. After he left the trailer, he changed his pants and shirt.

The jury convicted the defendant of two counts of first degree premeditated murder, one count of felony murder against the defendant's father, and one count of aggravated arson. The defendant contends that he should have been found not guilty by reason of insanity because he could not appreciate the wrongfulness of his actions when he killed his parents. The state contends that the evidence is sufficient. We agree with the state.

## I. INSANITY DEFENSE

The defendant contends that he proved by clear and convincing evidence that he was insane at the time of the killing. With regard to the defense of insanity, T.C.A. § 39-11-501 provides as follows:

> (a) It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of such defendant's acts. Mental disease or defect does not otherwise constitute a defense. The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

5

(b) As used in this section, "mental disease or defect" does not include any abnormality manifested only by repeated criminal or otherwise antisocial conduct.

(c) No expert witness may testify as to whether the defendant was or was not insane as set forth in subsection (a). Such ultimate issue is a matter for the trier of fact alone.

With respect to appellate review of a jury's rejection of a defendant's insanity defense, our supreme court has stated:

[A]ppellate courts in Tennessee should apply the reasonableness standard when reviewing a jury's rejection of the insanity defense. Consistent with the expressed legislative intent of Tenn. Code Ann. § 39-11-501(c) and other Tennessee standards governing appellate review of factual findings, this standard is properly deferential to the finding of the trier of fact. On the other hand, this standard does not totally insulate the jury's finding from appellate review; rather, it enhances appellate review by virtue of its similarity to the familiar sufficiency standard which appellate courts are accustomed to applying. Accordingly, appellate courts in Tennessee should reverse a jury verdict rejecting the insanity defense only if, considering the evidence in the light most favorable to the prosecution, no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence . . . . [W]e explicitly reject the notion that the State must rebut defense proof of insanity with substantial evidence. The current statute clearly does not impose such a burden of proof on the prosecution. The statute places the burden of establishing this affirmative defense squarely on the defendant. Once this defense has been interposed, the prosecution likely will in most cases attempt in some manner to counter the defense proof . . . . [D]efense proof can be countered by contrary expert testimony, lay witnesses, or vigorous cross-examination designed to undermine the credibility of the defense experts. A reviewing court applying the reasonableness standard should consider all the evidence in the record in the light most favorable to the state in determining whether the jury appropriately rejected the insanity defense.
. . . .

The weight and value to be given expert testimony is a question for the jury. [State v. Sparks, 891 S.W.2d 607, 616 (Tenn. 1995)]. Where

there is a conflict in the evidence, the trier of fact is not required to accept expert testimony over other evidence and must determine the weight and credibility of each in light of all the facts and circumstances of the case. Id. Questions concerning the credibility of witnesses, the weight and value of the evidence, as well as all factual disputes raised by the evidence, are for the trier of fact; appellate courts do not reweigh the evidence or reevaluate credibility determinations. [State v. Holder, 15 S.W.3d 905, 912 (Tenn. Crim. App. 1999)].

State v. Flake, 88 S.W.3d 540, 554 (Tenn. 2002).

Evidence existed to show that the defendant appreciated the wrongfulness of his actions when he killed the victims. Before the killings, the defendant had stated that he wanted a girlfriend and a place of his own and that he believed these things would happen if he killed his parents. Mr. Campbell testified that the defendant believed his mother owned property away from their trailer and that the defendant wanted this property. After killing his parents, the defendant acknowledged in his statement to the police that he panicked and set fire to the trailer to cover up killing his mother. The defendant also changed clothes and left the trailer after setting fire to it, showing a possible attempt to hide his involvement in the killings. Dr. Craddock and Dr. Megibow each testified that they believed the defendant knew the difference between right and wrong when he killed his parents.

The evidence shows that the defendant suffered from paranoid schizophrenia. However, this does not preclude the possibility that he could be found legally sane by a jury. T.C.A. § 39-11-501(a) (1997). The jury had the responsibility to give the proper weight and value to the expert and lay witnesses in determining whether the defendant was insane by clear and convincing evidence. Flake, 88 S.W.3d at 554. Although the defendant argues that the jury erred in not finding him insane at the time of the killing, the jury chose to accredit the witnesses who supported the state's theory of the case. The jury accredited testimony that the defendant, knowing it was wrong, killed his mother anyway because he thought he would get a girlfriend and place of his own. The defendant then panicked and tried to cover up the killing by setting fire to the trailer, changing clothes, and leaving the scene. Dr. Craddock testified that this indicated the defendant knew it was wrong to kill his parents. Further, Dr. Megibow also stated that he believed the defendant knew right from wrong when he killed his parents. In the light most favorable to the state, a rational trier of fact could have failed to find that the defendant's criminal insanity at the time of the offense was established by clear and convincing evidence. The evidence is sufficient to justify the defendant's convictions.

## II. MERGER

Although not raised by either party, we have concluded that the trial court should have merged the defendant's convictions for premeditated murder and felony murder of his father. Our supreme court has directed that when a defendant is charged with both premeditated and felony murder, the trial court should instruct the jury to render a verdict on both theories of first degree

7

murder. State v. Howard, 30 S.W.3d 271, 275 (Tenn. 2000). Yet, "when only one person has been murdered, a jury verdict of guilt on more than one count of an indictment charging different means of committing first degree murder will support only one judgment of conviction for first degree murder." State v. Cribbs, 967 S.W.2d 773, 788 (Tenn. 1998). Merger avoids a double jeopardy problem while protecting the jury's findings. Howard, 30 S.W.3d at 275. Thus, in this case, the trial court should have merged the jury's verdicts of guilt on the one count of premeditated murder and one count of felony murder into only one judgment of conviction for first degree premeditated murder. See Howard, 30 S.W.3d at 275; State v. Addison, 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997).

Based upon the foregoing and the record as a whole, we affirm the defendant's convictions but vacate the judgments of conviction for counts one and three and remand the case for the trial court to enter a judgment reflecting the merger of the two counts.


_____
JOSEPH M. TIPTON, JUDGE